The LUBRIZOL CORPORATION,
Plaintiff-Appellee,

v.

Russell E. TRAIN, Administrator, and the
United States Environmental Protection
Agency, Defendants-Appellants.

No. 76–1618.

United States Court of Appeals,
Sixth Circuit.

Argued June 22, 1976.

Decided Nov. 30, 1976.

Frederick M. Coleman, U.S. Atty., Cleveland, Ohio, Earl Salo, Alfred T. Ghiorzi, Dept. of Justice, Washington, D.C., Peter R. Taft, Edmund B. Clark, E.P.A., Paul Loizeaux, Washington, D.C., for defendants-appellants.

Geoffrey K. Barnes, James Van Carson, Squire, Sanders & Dempsey, Cleveland, Ohio, for plaintiff-appellee.

Before PHILLIPS, Chief Judge, and CELEBREZZE and PECK, Circuit Judges.

CELEBREZZE, Circuit Judge.

The Environmental Protection Agency (EPA) appeals from the granting of a preliminary injunction enjoining the enforcement of regulations promulgated under § 211(a) of the Clean Air Act[1] requiring the registration of motor vehicle fuels and fuel additives. *Registration of Fuels and Fuel Additives,* 40 Fed.Reg. 52009 (1975). The regulations define "fuel" to include motor vehicle engine oil, a substance added to an engine as a lubricant rather than as a source of propulsion. 40 Fed.Reg. at 52013. This action was brought by the Lubrizol Corporation, a major manufacturer of petroleum products, which contends that the Administrator of the EPA exceeded his authority under § 211(a) by requiring the registration of motor vehicle engine oil and its additives.

On January 5, 1976, Lubrizol filed a complaint and a motion for a preliminary injunction in the Northern District of Ohio. Previously, on December 8, 1975, Lubrizol had filed a petition to review the same regulations in the Court of Appeals for the District of Columbia Circuit asserting as a basis for jurisdiction § 307(b)(1) of the Clean Air Act.[2] Thus, identical actions were filed in the District of Columbia Circuit and the Northern District of Ohio.[3] The EPA moved to dismiss the district court action arguing that § 307(b)(1) vests exclusive subject matter jurisdiction in the District of Columbia Circuit Court to review regulations promulgated under § 211. Lubrizol argues that § 307(b)(1) jurisdiction is limited to "controls or prohibitions" issued under § 211(c) and that registration requirements under § 211(a) are reviewable in district courts. The District Court denied the motion to dismiss holding that it had jurisdiction to review the regulations under the Administrative Procedure Act, 5 U.S.C. § 702 (1970), and 28 U.S.C. § 1331 (1970). Because we conclude that Congress intended that jurisdiction to review registration requirements promulgated under § 211(a) lies exclusively in the District of Columbia Circuit Court of Appeals, we reverse.

---

1. 42 U.S.C.A. § 1857f–6c(a) (Supp.1976).

2. 42 U.S.C.A. § 1857h–5(b)(1) (Supp.1976).

3. The decision to file in both courts was reasonable given the jurisdictional dispute. If Lubrizol had filed only in the District Court and jurisdiction was later held to be exclusively in the District of Columbia Circuit, subsequent filing in the Court of Appeals would be barred by the running of the 30-day limitation period of § 307(b)(1). 42 U.S.C.A. § 1857h–5(b)(1).

Proceedings in the courts have paralleled each other. On January 8, 1976, three days after filing in the District Court, Lubrizol moved the District of Columbia Circuit Court for a stay of the regulations pending review. On January 21st, the District of Columbia Court denied Lubrizol's motion for a stay pending review. On February 3rd, the District Court granted the preliminary injunction. On April 19th, Lubrizol motioned the District of Columbia Court to stay further proceedings pending outcome of the instant appeal. The motion was denied on May 25th. The case is currently pending in the District of Columbia Circuit.

Section 211 gives the Administrator the authority to regulate fuels and fuel additives. 42 U.S.C. § 1857f–6c. The regulatory process prescribed by § 211 is bifurcated. The first step in regulating a fuel or fuel additive is registration under § 211(a):

[T]he Administrator may by regulation designate any fuel or fuel additive and, after such date or dates as may be prescribed by him, no manufacturer or processor of any such fuel or additive may sell, offer for sale, or introduce into commerce such fuel or additive unless the Administrator has registered such fuel or additive in accordance with subsection (b) of this section.

42 U.S.C. § 1857f–6c(a). The function of the registration process is information gathering. Section 211(b) gives the Administrator the authority to require manufacturers of fuels and fuel additives to supply the EPA with detailed information about their products.[4] 42 U.S.C. § 1857f–6c(b)(1), (2). The information gathered during the registration phase becomes the primary basis for the Administrator's decision whether to invoke his authority to "control or prohibit" the introduction of a fuel or fuel additive into commerce under § 211(c):

The Administrator may, from time to time on the basis of information obtained under subsection (b) of this section or other information available to him, by regulation, control or prohibit the manufacture, introduction into commerce, offering for sale, or sale of any fuel or fuel additive for use in a motor vehicle or motor vehicle engine (A) if any emission products of such fuel or fuel additive will endanger the public health or welfare, or (B) if emission products of such fuel or fuel additive will impair to a significant degree the performance of any emission control device or system which is in general use, or which the Administrator finds has been developed to a point where in a reasonable time it would be in general use were such regulation to be promulgated.

42 U.S.C. § 1857f–6c(c)(1).

Although the District Court acknowledged that registration is an integral step in § 211's regulatory process and conceded that "frustration of the information gathering function could emasculate a seemingly workable control program," the Court concluded that Congress had intended to differentiate registration under § 211(a) and "control and prohibition" under § 211(c) for purposes of judicial review. The District Court rested this conclusion on the fact that § 211(a) was originally enacted as part of the Air Quality Act of 1967[5] while § 211(c)

---

**4.** (b)(1) For the purpose of registration of fuels and fuel additives, the Administrator shall require—

(A) the manufacturer of any fuel to notify him as to the commercial identifying name and manufacturer of any additive contained in such fuel; the range of concentration of any additive in the fuel; and the purpose-in-use of any such additive; and

(B) the manufacturer of any additive to notify him as to the chemical composition of such additive.

(2) For the purpose of registration of fuels and fuel additives, the Administrator may also require the manufacturer of any fuel or fuel additive—

(A) to conduct tests to determine potential public health effects of such fuel or additive (including, but not limited to, carcinogenic, teratogenic, or mutagenic effects), and

(B) to furnish the description of any analytical technique that can be used to detect and measure any additive in such fuel, the recom-

mended range of concentration of such additive, and the recommended purpose-in-use of such additive, and such other information as is reasonable and necessary to determine the emissions resulting from the use of the fuel or additive contained in such fuel, the effect of such fuel or additive on the emission control performance of any vehicle or vehicle engine, or the extent to which such emissions affect the public health or welfare.

Tests under subparagraph (A) shall be conducted in conformity with test procedures and protocols established by the Administrator. The result of such tests shall not be considered confidential.

(3) Upon compliance with the provision of this subsection, including assurances that the Administrator will receive changes in the information required, the Administrator shall register such fuel or fuel additive.

**5.** Act of November 21, 1967, Pub.L. No. 90–148, § 2, 81 Stat. 502. *See generally* 2 U.S.

and § 307(b)(1) were both added by the Clean Air Amendments of 1970.[6] The District Court assumed that prior to 1970, regulations under the Clean Air Act would be reviewable by district courts under the Administrative Procedure Act. From this assumption the Court reasoned that Congress had meant to limit § 307(b)(1) jurisdiction to a review of agency action under new authority granted by the 1970 amendments and had not meant to disturb the jurisdiction of district courts to review administrative actions undertaken pursuant to prior existing law. The District Court cites no authority for its assumption that district courts had jurisdiction to review registration requirements prior to 1970 or that Congress, in enacting § 307(b)(1), had acquiesced in a bifurcated system of review for § 211 regulations. We believe that the District Court underestimated the extent and nature of the changes to the structure of the Clean Air Act wrought by the 1970 amendments.[7]

As the District Court noted, the Clean Air Act was not the product of a single legislative act but was developed incrementally. The emphasis in the original act was on regional regulation of air quality.[8] The states set standards for their regions and were responsible for enforcement.[9] The federal government was relegated to the relatively minor role of providing technical assistance to state and local governments and conducting general research.[10] The Clean Air Amendments of 1970 represented a dramatic departure from previous policy. *See Train v. Natural Resources Defense Council,* 421 U.S. 60, 63–64, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975). Although enacted in the form of amendments to existing law, the 1970 legislation changed the focus of the existing regulatory structure by shifting primary responsibility in a number of areas from the states to the federal government.[11] Dissatisfied with state efforts to curtail air pollution, Congress endowed the federal government with much greater authority and responsibility to combat air pollution which was now perceived as a national problem.[12] The federal effort was concentrated in a new agency, the Environmental Protection Agency, whose Administrator was charged with coordinating the national war against air pollution.[13]

The evolution of the Administrator's authority to regulate fuels and fuel additives exemplifies the radical change in the structure of the Clean Air Act. Section 211(a) was originally enacted as § 210 of the Air Quality Act of 1967.[14] It had been apparent for a long time that automobile emissions were a major source of air pollu-

---

Code Cong. & Admin.News 1967, 90th Cong., 1st Sess., at p. 1958.

**6.** Pub.L. No. 91–604, §§ 89(a), 12(a), 84 Stat. 1698, 1707 (Dec. 31, 1970). *See generally* 3 U.S.Code Cong. & Admin.News 1970, 91st Cong., 2d Sess., at p. 5356.

**7.** The entire legislative history of the 1970 amendments to the Clean Air Act has been collected in a two volume print published by the Senate Committee on Public Works. Senate Comm. on Public Works, 93rd Cong., 2d Sess., A Legislative History of the Clean Air Amendments of 1970 (Comm.Print 1974) (hereinafter *Legis.His.*).

**8.** *See, e. g.,* The Air Quality Act of 1967, Pub.L. No. 90–148, Title I, § 101(a)(3), 81 Stat. 485. *See generally Train v. Natural Resources Def. Council,* 421 U.S. 60, 63–64, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975).

**9.** *See* H.Rep. No. 728, 90th Cong., 1st Sess., *reprinted* in 2 U.S.Code Cong. & Admin.News 1967, at p. 1939.

**10.** *See, e. g.,* 2 U.S.Code Cong. & Admin.News 1967, 90th Cong., 1st Sess., at p. 1959. *See generally Train v. Natural Resources Def. Council,* 421 U.S. at 63–64, 95 S.Ct. 1470.

**11.** *See generally id.* at 64, 95 S.Ct. 1470.

**12.** *See, e. g., Legis.His.* at 125 (Sen. Muskie).

**13.** Reorg.Plan No. 3 of 1970, § 2(a)(3) (Dec. 2, 1970), 35 F.R. 15623, 84 Stat. 2086, transferred to the Administrator of the Environmental Protection Agency functions previously exercised by the Secretary of Health, Education and Welfare.

**14.** *See* note 5 *supra.*

tion.[15] The 1967 Act authorized the Secretary of Health, Education and Welfare to collect data on the composition of fuels and fuel additives through an industry-wide registration program.[16] The only function of the registration program was "to insure full access to the technical information needed to evaluate the possible health hazard of such materials." H.R.Rep. No. 728, 90th Cong., 1st Sess. (1967), *reprinted in* 2 U.S.Code Cong. & Admin.News 1967, at p. 1958. There was no provision in the Act for the Secretary to take any direct action based on the information he received during registration.[17] H.Rep. No. 91–1146, 91st Cong., 2d Sess. (1970), *reprinted in Legis. His.* at 894. The lack of federal regulatory authority over fuels and fuel additives was perceived as a major weakness in existing law.[18] During hearings on the need for amending the Clean Air Act, it became evident that there was widespread dissatisfaction with the existing registration program for fuels and fuel additives.[19] Congress responded by replacing § 210 with § 211 of the Clean Air Amendments of 1970. 42 U.S.C. § 1857f–6c, *as amended* Pub.L. No. 91–604, §§ 8(a), 9(a), 84 Stat. 1694–98 (Dec. 31, 1970). Section 211(a) retained the registration provision of prior law, but its function was radically altered. *See* 3 U.S.Code Cong. & Admin.News 1970, 91st Cong., 2d Sess., at pp. 5384–85. Registration, which had served an amorphous function prior to 1970, now has become an important step in a national program to regulate fuels and fuel additives.[20] Before a fuel or a fuel additive may be regulated under § 211(c), it must be registered under § 211(a), 42 U.S.C. § 1857f–6c. The data gathered during the registration phase forms a major part of the administrative record upon which the decision to control or prohibit is made.[21] The administrative record also serves as the primary basis for judicial review of regulations promulgated under § 211. More than anything else, the integral relationship of subsection (a) registration and subsection (c) control and prohibition in the overall plan to regulate fuels

15. In 1955 the Surgeon General was authorized to study the problem of air pollution, to support research, training and demonstration projects, and to provide technical assistance to state and local governments attempting to abate pollution. 69 Stat. 322. In 1960 Congress directed the Surgeon General to focus his attention on the health hazards resulting from motor vehicle emissions. Pub.L. No. 86–493, 74 Stat. 162. *See Train v. Natural Resources Def. Council,* 421 U.S. at 63, 95 S.Ct. 1470.

16. *See* H.Rep. No. 728, *reprinted in* 2 U.S.Code Cong. & Admin.News 1967, 90th Cong., 1st Sess., at p. 1958.

17. Once the information required by § 210(b) had been received, the Secretary was required to register the fuel or fuel additive without recourse under the statute to restrict sale of potentially hazardous products. *See* 2 U.S. Code Cong. & Admin.News 1967, 90th Cong., 1st Sess., at pp. 1958–59.

18. *See, e. g., Hearings Before the Subcomm. on Air and Water Pollution of the Senate Comm. on Public Works,* 91st Cong., 2d Sess. (March 17, 1970), *reprinted in Legis.His.* at 978 (statement of Robert Finch, Sec'try of HEW); *id.* at 986 (statement by John Veneman, Undersec'try of HEW).

19. In fact, the registration program authorized by § 210 of the Air Quality Act of 1967 had not been implemented. *See Legis.His.* at 819, 1342, 1404–05. Dr. John T. Middleton, the Commissioner of the National Air Pollution Control Administration, explained during testimony before the House Subcommittee on Public Health and Welfare that the Department of Health, Education and Welfare had not implemented the registration program under the 1967 Act because the possibility of registering a product "that was believed to have an adverse effect . . . presented a problem to the Department." This problem, he assured the Committee, would be solved by the new regulatory authority granted by the amendments. *Hearings Before the Subcomm. on Public Health and Welfare of the House Comm. on Interstate and Foreign Commerce,* 91st Cong., 2d Sess. (March 16, 1970), *reprinted in Legis.His.* at 1404–05.

20. *See Legis.His.* at 135 (Sen. Muskie); S.Rep. No. 1196, 91st Cong., 2d Sess., at 33, *reprinted in Legis.His.* at 433; *Legis.His.* at 842 (Rep. Tiernan); *Legis.His.* at 847 (Rep. Cohelan).

21. Section 211 requires the Administrator to make certain findings based on information available to him before he may control or prohibit the introduction of a fuel or fuel additive into commerce. 42 U.S.C. § 1857f–6c(c)(1), (2)(A), (B), (C).

and fuel additives makes it unlikely that Congress intended that judicial review of the Administrator's actions under § 211 should be bifurcated.

██ The District Court concluded that Congress had not meant to include registration orders under § 211(a) within the exclusive jurisdictional grant of § 307(b)(1), but preferred instead to allow district courts to retain jurisdiction over the registration process. However, the legislative history suggests that Congress was uncertain as to the availability of judicial review of administrative actions under the previous law and was anxious about the effect of judicial review on the overall Clean Air program:

> One of the uncertainties in the existing Clean Air Act is the availability or opportunity for judicial review of administratively developed and promulgated standards and regulations. Moreover, the effect on the general program of a review itself is not clear.

S.Rep. No. 91–1196, 91st Cong., 2d Sess., at 40; *Legis.His.* at 440.[22] Faced with uncertainties about the prospect of judicial review, Congress established § 307(b)(1) which requires that appeals from certain actions of the Administrator be brought exclusively within the jurisdiction of the Court of Appeals for the District of Columbia Circuit:

> (b)(1) A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard under section 1857c—7 of this title, any standard of performance under section 1857c—6 of this title, any standard under section 1857f—1 of this title (other than a standard required to be prescribed under section 1857f—1(b)(1) of this title),

any determination under section 1857f—1(b)(5) of this title, any control or prohibition under section 1857f—6c of this title, or any standard under section 1857f—9 of this title may be filed only in the United States Court of Appeals for the District of Columbia.

42 U.S.C.A. § 1857h–5(b)(1). The Senate Report disclosed the rationale for concentrating review in a single court:

> Because many of these administrative actions are national in scope and require even and consistent national application, the provision specifies that any review of such actions shall be in the United States Court of Appeals for the District of Columbia.

S.Rep. No. 91–1196, 91st Cong., 2d Sess., at 441 (1970). Petitions to appeal administrative actions under this section must be filed within 30 days of the challenged action and may not be challenged in subsequent enforcement proceedings. 42 U.S.C.A. § 1857h–5(b)(1).

By centralizing appeals in the District of Columbia Circuit Court within a limited time period, Congress hoped to avoid needless delays in the implementation of important national programs caused by incessant litigation and inconsistent decisions. In *Natural Resources Defense Council v. EPA*, 168 U.S.App.D.C. 111, 512 F.2d 1351, 1354–56 (1975), the District of Columbia Circuit Court reviewed the legislative history of § 307(b) and concluded that Congress granted that Court exclusive jurisdiction to review regulations which are national in scope "to ensure uniformity in decisions concerning issues of more than purely local or regional impact." 512 F.2d at 1356. In *Dayton Power & Light Co. v. EPA*, 520

---

**22.** While the Senate was uncertain about the availability of judicial review under existing law, they were fairly certain that the Supreme Court's decision in *Barlow v. Collins*, 397 U.S. 159, 167, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), and *Abbot Laboratories v. Gardner*, 387 U.S. 136, 140–41, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), would require judicial review of administrative actions under the Act as amended. S.Rep. No. 91–1196, at 40; *Legis.His.* at 440. They also knew that unless they inserted an

alternate system of review in the Act, the national regulatory programs they initiated would be reviewable in district courts under the Administrative Procedure Act. S.Rep. No. 91–1196 at 40–41; *Legis.His.* at 440–41. To avoid review in the district courts, they created the review procedure of § 307(b)(1). S.Rep. No. 91–1196 at 41; *Legis.His.* at 441. *See Natural Res. Def. Council, Inc. v. EPA*, 168 U.S.App. D.C. 111, 512 F.2d 1351, 1354 (1975).

F.2d 703 (6th Cir. 1975), petitioners sought to challenge an air quality deterioration regulation issued by the EPA which uniformly amended state implementation plans. Identical petitions had been filed in a number of other circuit courts, including the Court of Appeals for the District of Columbia Circuit. 520 F.2d at 705. Petitioners based jurisdiction on the second sentence of § 307(b)(1) which provides that appeals from the Administrator's action in approving or promulgating any state implementation plan may be filed only in the United States Court of Appeals for the "appropriate" circuit. 42 U.S.C.A. § 1857h–5(b)(1). In deciding that the District of Columbia Circuit was the "appropriate" circuit to review implementation plans which were uniform among the states, we noted that the regulations were the "product of a unitary rule-making proceeding; " were national in scope and intended to apply uniformly throughout the country; no question of fact or law would vary by region; and that allowing the cases to proceed simultaneously in the various circuit courts would create a risk of inconsistent results and seriously delay the effectuation of the important national policies embodied in the Clean Air Act. 520 F.2d at 708. Earlier, in *Natural Resources Defense Council v. EPA*, 465 F.2d 492, 495 (1st Cir. 1972), the First Circuit had also decided that the District of Columbia Circuit was the "appropriate" circuit to review uniform state implementation plans. Observing that the plans reflect national rather than regional policy, the Court remarked that Congress, by enacting § 307(b)(1), had demonstrated the intent not

to tie up judicial manpower solving identical and complex legal and factual issues.

 For similar reasons, we conclude that Congress intended that registration under § 211(a) be reviewable only by the District of Columbia Circuit Court within its § 307(b)(1) jurisdiction. The grant of authority in § 211(a), like that of all the statutory provisions referred to in § 307(b)(1), is national in scale.[23] The regulations challenged by Lubrizol are intended to apply throughout the nation on an industry-wide basis. 40 Fed.Reg. 52009. After the date prescribed by the Administrator, no manufacturer or processor of a fuel or fuel additive may sell, offer for sale or introduce into commerce its product unless it is registered with the EPA.[24] 42 U.S.C. § 1857f–6c(a). The regulations in question were promulgated following publication of a notice of proposed rulemaking, 39 Fed. Reg. 8929, and a period of public comment during which a number of comments were received from interested parties, including Lubrizol. *See* 40 Fed.Reg. 52009. A reviewing court would have to examine the administrative record to determine whether the regulations are authorized by statute, but the court is not free to substitute its factfinding for the findings made by the Administrator. *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415–21, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The legal issue sought to be raised by Lubrizol could well have been raised by any other manufacturer or processor of motor vehicle engine oil or its additives in the nation. Since resolution of the Administrator's statutory authority to promulgate registration

---

**23.** Not all the actions made reviewable by § 307(b)(1) however, are pursuant to authority granted by the 1970 amendments. Among the actions made reviewable is the promulgation of motor vehicle emission standards. 42 U.S.C. § 1857h–5(b)(1). The secretary had that authority under § 202(a) of the Air Quality Act of 1967. *See Legis.His.* at 1563. Section 307(b)(1) also makes reviewable the promulgation of ambient air quality standards. 42 U.S.C.A. § 1857h–5(b)(1). Authority to promulgate such standards existed under the 1967 Act, but the standards were only effective state-wide, whereas the 1970 amendments authorized national standards. *See Legis.His.* at 1552–53.

**24.** When the Administrator designates a fuel or fuel additive for registration, he "controls" the product to the extent that manufacturers must comply with § 211(b)'s reporting requirements. *Cf. Amoco Oil Co. v. EPA*, 163 U.S.App.D.C. 162, 501 F.2d 722 (1974). While this is not a "control" under § 211(c), a manufacturer is left with little choice but to comply or to remove his product from the market or face a fine of $10,000 a day for each and every day of noncompliance. 42 U.S.C.A. § 1857f–6c(d). Identical fines are levied for violation of § 211(a) and (c). *Id.*

requirements does not require inquiry into the unique factual circumstances of each manufacturer or processor, it is difficult to agree with the District Court's statement that there is a "need for the fact-finding ability or function of a district judge."[25] If we were to agree with the District Court that Congress intended that review of administrative action under § 211 should be bifurcated, we would undermine the policies Congress sought to achieve by enacting § 307(b)(1). District court review of these regulations would be time consuming and duplicative since the decision of the district court will generally be appealed to a court of appeals which will simply review the same administrative record and assess the agency action anew without special deference to the district court's opinion.[26] *See e. g., First National Bank v. Smith*, 508 F.2d 1371, 1374 (8th Cir. 1974); *Polcover v. Sec'try of Treasury*, 155 U.S.App.D.C. 338, 477 F.2d 1223, 1225–28 (1973). Review of these regulations by the district courts would also lack the preclusive effect of judicial review within the statutory framework. The 30-day time limitation of § 307(b)(1) is "designed to get issues resolved promptly and thereby prevent delay in cleaning the air." *Granite City Steel Co.*

*v. EPA*, 501 F.2d 925, 926 (7th Cir. 1975). Since district court jurisdiction would not be under § 307(b)(1), Plaintiffs would not be bound by that section's limitation period and challenges to Clean Air regulations could be brought at any time even during enforcement proceedings, further delaying implementation of the regulations. Finally, allowing district courts to review regulations under § 211(a) would present a grave risk of inconsistent results and encourage forum shopping. *Cf. Anaconda Co. v. Ruckelshaus*, 482 F.2d 1301, 1304–05 (10th Cir. 1973). This is precisely what Congress hoped to avoid when they enacted § 307(b)(1). The precedential value of district and appellate decisions is limited by region. However, by vesting jurisdiction exclusively in the District of Columbia Circuit Court to review actions of the Administrator under the Clean Air Act which are national in scope, Congress established a single, national forum whose decisions would be uniform and final, save for review by the Supreme Court. Significant delays in implementing the EPA's registration program caused by unnecessary and duplicative judicial review will only forestall the regulation of fuels and fuel additives, a result Congress clearly did not intend. Senator

**25.** Since an appellate court may review the administrative record and interpret the statute as capably as a district court, requiring plaintiffs to proceed initially at the district level would unnecessarily delay implementation of the Clean Air Act. Congress enacted § 307(b)(1) as an alternative to the usual bifurcated system of review under the Administrative Procedure Act. Senator Cooper, an advocate of a unified system of judicial review, offered an explanation why the District of Columbia Circuit Court was chosen as the forum:

> I prefer the judicial review framework in the bill for I believe that through the administrative process the Secretary can develop on the record all of the technical and other relevant information necessary to achieve a sound judgment. Similarly, and in accordance with general administrative law, such decision of the Secretary, should be reviewable in the court of appeals so that the interests of all parties can be fully protected. With the record developed by the Secretary, the court, as an unbiased, independent institution, is the appropriate forum for reviewing such decision and making a judgment as to

> its quality. The normal rules of the court also provide the greatest amount of insulation from the political pressures that will undoubtedly surround a judgment of this type. At the same time, judicial review provides for full procedural and substantive due process for all interested parties.

*Legis.His.* at 386.

**26.** The parties are more likely to appeal from a district court judgment in a case involving judicial review of agency rulemaking than in a typical district court lawsuit. The petitioners, for example, are usually corporations with a substantial financial interest in the outcome, or an association of such corporations. They have already made a substantial effort to build a record before the agency and the additional cost of appeal is accordingly not great. Similarly, the agency, having formulated its interpretation of the statute it administers, proposed regulations, received comment, and promulgated final regulations, is unlikely to accept an adverse decision from a district court. *See generally* Currie & Goodman, *Judicial Review of Federal Administrative Action: Quest for the Optimum Forum*, 75 Colum.L.Rev. 1 (1975).

Muskie, a principal proponent of the 1970 Clean Air Amendments, presented the compromise legislation to the Senate along with the conference report. *Legis.His.* at 123. He appended a summary of the proposed amendments which stressed the need for expedition in implementing the regulatory program for fuels and fuel additives:

> While the conference substitute specifies procedures under section 211 which the Administrator will use in determining whether to prohibit or control fuels or fuel additives, the conference committee wishes to call the Administrator's attention to the relationship between his functions under this section and the emission deadlines stipulated in Section 202. *It is not the intent of the Congress to create a cumbersome, time consuming administrative procedure which will delay necessary controls on fuels and fuel additives required to meet these deadlines.*

*Legis.His.* at 135 (emphasis added). The additional delays imposed by a bifurcated system of judicial review of § 211 regulations would only serve to thwart our national commitment to the expeditious removal of harmful elements from automobile emissions.

Although this is a case of first impression, we find a number of courts of appeals have rejected similar arguments that judicial review of EPA rulemaking under the Federal Water Pollution Act, 33 U.S.C.A. § 1251 *et seq.* (Supp.1976), should be bifurcated between district courts and the courts of appeals. The judicial review provision of the Water Act, § 509(b)(1), is quite similar to § 307(b)(1) of the Clean Air Act in that it provides that actions to review specified

acts of the Administrator may only be brought in the courts of appeals within 90 days of the contested acts and that the validity of the administrative actions may not be relitigated in subsequent enforcement proceedings in the district courts.[27] The similarity of the Clean Air Act and the Water Act have led courts to refer to provisions of one act when interpreting its counterpart in the other. *See e. g., Ethyl Corp. v. EPA,* 541 F.2d 1, 17 (D.C.Cir. 1976) (*en banc*); *Natural Resources Defense Council, Inc. v. Train,* 166 U.S.App.D.C. 312, 510 F.2d 692, 701–02 (1975). In *E. I. duPont de Nemours and Co. v. Train,* 528 F.2d 1136, 1137 (4th Cir. 1975), *cert. granted* 425 U.S. 933, 96 S.Ct. 1662, 48 L.Ed.2d 174 (1976), Appellants argued that district courts had jurisdiction under the Administrative Procedure Act to review effluent limitations regulations issued by the Administrator to control effluent discharges from existing plants. In refuting this contention, the Fourth Circuit observed:

> Were we to accept appellants' interpretation of the Act, review of regulations governing existing sources would lie in the district courts under the Administrative Procedure Act, while review of new source standards would be before the courts of appeals under § 509. We do not conclude that Congress intended for review to be bifurcated in this manner.

528 F.2d at 1141 (footnote omitted). The Court noted that the committee reports made no mention of a division of judicial review. *Id.* at 1141. The House bill had originally provided for review in the district courts but during conference, the House Committee had opted for the Senate version

---

**27.** (b)(1) Review of the Administrator's action (A) in promulgating any standard of performance under section 1316 of this title, (B) in making any determination pursuant to section 1316(b)(1)(C) of this title, (C) in promulgating any effluent standard, prohibition, or pretreatment standard under section 1317 of this title, (D) in making any determination as to a State permit program submitted under section 1342(b) of this title, (E) in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, or 1316 of this title, and (F) in issuing or denying any permit

under section 1342 of this title, may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts such business upon application by such person. Any such application shall be made within ninety days from the date of such determination, approval, promulgation, issuance or denial, or after such date only if such application is based solely on grounds which arose after such ninetieth day.

33 U.S.C.A. § 1369(b)(1) (Supp.1976).

which provided for direct review by the courts of appeals:

> Although the House Bill originally provided for review in the district courts, this report indicates that Congress did not intend for the actions of the Administrator to be subjected to the complexities inherent in a system of review divided between different courts. Rather, it appears to have been its desire that administrative actions be reviewable, but in a manner not likely to impede enforcement unduly.

*Id.* at 1141–42. The Court concluded that Congress, by enacting § 509(b), established "a statutory plan to be followed to obtain judicial review of agency actions under the Act," *id.* at 1142, and that district courts were without jurisdiction to review regulations which were committed to the jurisdiction of the courts of appeals.[28] The legislative history of the Clean Air Act is susceptible to similar analysis. The House had not included a provision for judicial review comparable to § 307(b)(1) in its version of the 1970 amendments. During debate on the House bill, Representatives Rogers and Staggers, members of the committee, expressed the belief that any regulations governing fuel additives would be reviewable in district courts under the Administrative Procedure Act. *Legis.His.* at 854–56. The Conference Committee, including Representatives Rogers and Staggers, opted for the exclusive judicial review provision of the Senate bill.[29] That the House acceded to the Senate plan for centralized review of certain administrative actions in the District of Columbia Circuit Court indicates that Congress did not contemplate dividing review of the important national program for regulating fuels and fuel additives between different forums. If Congress had intended that review of § 211(a) registration requirements be in the district courts

they could have so provided in the Act, or, at the very least, expressed that intention in the legislative history. But, as the District of Columbia Circuit Court of Appeals has stated: "[a]ll that the Clean Air Act says about judicial review of EPA action under § 211 is that it shall be available exclusively in this Court. 42 U.S.C. § 1857h–5(b)(1)." *Ethyl Corp. v. EPA*, 541 F.2d at 34 n. 70. *See also Amoco Oil Co. v. EPA*, 163 U.S.App.D.C. 162, 501 F.2d 722, 731 n. 23 (D.C.Cir. 1974).

For the reasons stated above, we conclude that Congress intended that the Court of Appeals for the District of Columbia Circuit has exclusive jurisdiction to review registration requirements under § 211. Therefore, the District Court was without jurisdiction to grant the preliminary injunction. The case is remanded to the District Court with directions to enter an order dismissing the action for lack of jurisdiction.

Reversed and remanded.

---

28. *Accord, Hooker Chemicals & Plastics Corp. v. Train*, 537 F.2d 620 (2d Cir. 1976); *American Frozen Food Institute v. Train*, 539 F.2d 107 (D.C.Cir. 1976); *American Meat Institute v. EPA*, 526 F.2d 442, 452 (7th Cir. 1975); *American Iron & Steel Institute v. EPA*, 526 F.2d 1027, 1035–42 (3d Cir. 1975); *American Petroleum Institute v. Train*, 526 F.2d 1343 (10th Cir.

1975). *Contra, CPC International v. Train*, 515 F.2d 1032 (8th Cir. 1975).

29. *See* Conf.Rep. No. 91–1783, 91st Cong., 2d Sess. (1970), *reprinted in* 3 U.S.Code Cong. & Admin.News 1970, at p. 5389; *Legis.His.* at 207.