**UNITED STATES of America, Plaintiff,**

v.

**BORDEN, INC., Defendant.**

**Civ. A. No. 83–1892–MA.**

United States District Court,
D. Massachusetts.

Sept. 30, 1983.

William F. Weld, U.S. Atty., Ralph A. Child, Asst. U.S. Atty., Boston, Mass., Elizabeth Yu, Environmental Enforcement Section, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

Joseph L. Kociubes, and Jane E. Serene, Bingham, Dana & Gould, Boston, Mass., for defendant.

MEMORANDUM AND ORDER

MAZZONE, District Judge.

The United States, at the request of the Administrator of the Environmental Protection Agency (Administrator), brought this action against Borden, Inc. (Borden) pursuant to Section 113(b) of the Clean Air Act (Act), 42 U.S.C. § 7401 *et seq.* The United States alleges that Borden, at its polyvinyl chloride plant in Leominster, Massachusetts, has released and continues to release to the atmosphere vinyl chloride, a hazardous air pollutant, in violation of Section 112(c) of the Act. The United States seeks civil penalties and injunctive relief. This action is before the Court on the defendant's motion to dismiss for failure to state a claim upon which relief can be

granted. Borden filed a memorandum in support of this motion. The United States filed a memorandum in opposition, to which Borden filed a reply brief.

The statutory and factual background of this action is as follows. Section 112(b)(1) of the Act requires the Administrator to list hazardous air pollutants and establish emission standards for each. A "hazardous" air pollutant "causes, or contributes to, air pollution which may reasonably be anticipated to result in an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness." Clean Air Act § 112(a)(1). Vinyl chloride has been implicated as the causal agent of angiosarcoma, a form of liver cancer, and other carcinogenic and non-carcinogenic disorders in persons with occupational exposure, and animals with experimental exposure, to it. Pursuant to his authority under Section 112(b)(1) of the Act, the Administrator identified vinyl chloride as a hazardous air pollutant and proposed regulations to limit discharges. 40 Fed.Reg. 59477 (December 24, 1975). The "National Emission Standard for Vinyl Chloride" was promulgated as a final regulation on October 21, 1976. 41 Fed.Reg. 46560, now codified at 40 C.F.R. § 61.60 et seq.

Vinyl chloride is principally used in the manufacture of polyvinyl chloride resins which, in turn, are used to produce plastic materials. It is chemically reacted with water and other substances under conditions of heat and pressure. Emissions of vinyl chloride gas into the atmosphere may occur at various points in polyvinyl chloride manufacturing; valves are placed at a number of locations to provide for gas escape under conditions of excessive pressure. The specific regulations that the United States seeks to enforce concern valve discharge:

> Relief valve discharge. Except for an emergency relief discharge, there is to be no discharge to the atmosphere from any relief valve on any equipment in vinyl chloride service. An emergency relief discharge means a discharge which could not have been avoided by taking meas-

ures to prevent the discharge. Within 10 days of any relief valve discharge, the owner or operator of the source from which the relief valve discharge occurs shall submit to the Administrator a report in writing containing information on the source, nature and cause of the discharge, the date and time of the discharge, the approximate total vinyl chloride loss during the discharge, the method used for determining the vinyl chloride loss, the action that was taken to prevent the discharge, and measures adopted to prevent future discharges.

40 C.F.R. § 61.65(a), and

> (a) Reactor. The following requirements apply to reactors:
>
> * * * * * *
>
> (3) Manual vent valve discharge: Except for an emergency manual vent valve discharge, there is to be no discharge to the atmosphere from any manual vent valve on a polyvinyl chloride reactor in vinyl chloride service. An emergency manual vent valve discharge means a discharge to the atmosphere which could not have been avoided by taking measures to prevent the discharge. Within 10 days of any discharge to the atmosphere from any manual vent valve, the owner or operator of the source from which the discharge occurs shall submit to the Administrator a report in writing containing information on the source, nature and cause of the discharge, the date and time of the discharge, the approximate total vinyl chloride loss during the discharge, the method used for determining the vinyl chloride loss, the action that was taken to prevent the discharge, and measures adopted to prevent future discharges.

40 C.F.R. § 61.64(a)(3).

Section 112(c)(1)(B) of the Act provides that no hazardous air pollutant may be emitted from any stationary source in violation of a national emission standard. For violations of this section by an owner or operator of a major stationary source, Section 113(b) provides that the Administrator shall commence a civil action for a perma-

nent injunction or a civil penalty of not more than $25,000 per day of violation, or both.

Congress amended the Act in 1977 by adding Section 112(e)(1)–(4). Pub.L. 95–95, § 110, 91 Stat. 703. These provisions authorize the Administrator to promulgate a "design, equipment, work practice, or operational standard" (work practice standard) where, in his judgment, "it is not feasible to prescribe or enforce an emission standard for control of a hazardous air pollutant." [1] Clean Air Act § 112(e)(1). In 1978, Congress gave the Administrator the authority to enforce work practice standards by adding Section 112(e)(5), which provides that any design, equipment, work practice, or operation standard "shall be treated as an emission standard for purposes of the provisions of this chapter."

The Act also limits judicial review of the Administrator's promulgation of emission standards: "A petition for review of action of the Administrator in promulgating ... any emission standard or requirement under section 112 of this title ... may be filed only in the United States Court of Appeals for the District of Columbia.... Any petition for review filed under this subsection shall be filed within sixty days from the date notice of such promulgation ... appears in the Federal Register...." Clean Air Act § 307(b)(1). The Act further precludes challenges to emission standards in enforcement proceedings: "Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement." Clean Air Act § 307(b)(2).

The United States alleges that Borden discharged vinyl chloride from relief valves at its Leominster, Massachusetts plant on four specified and many unspecified occasions since 1976, all in violation of the vinyl chloride relief valve regulations. The United States seeks civil penalties of $25,000 per day of violation, plus an injunction requiring Borden to cease its violations.

Defendant Borden does not deny that its Leominster plant is a "stationary source" subject to the Act's prohibition on emissions in violation of a national emission standard. Nor does Borden deny that it released vinyl chloride from relief valves in the amounts and on the occasions alleged in the United States' complaint. Borden does not dispute the allegation that these emissions were neither "emergency relief discharges" nor "emergency manual vent valve discharges." Instead, Borden contends that these regulations are not enforceable emission standards. Borden argues that they are actually work practice standards, promulgated in 1976 when the Administrator had authority only to promulgate emission standards. Since these regulations were not repromulgated following the 1977 and 1978 amendments to the Act, which authorized work practice standards and made them enforceable as "emission standards," Borden claims they are unenforceable as a matter of law. Accordingly, Borden moves to dismiss the plaintiff's complaint.

For purposes of the defendant's motion to dismiss, the complaint must be construed in the light most favorable to the plaintiff United States and its allegations must be taken as true. *Jenkins v. McKeithen,* 395 U.S. 411, 421–22, 89 S.Ct. 1843, 1848–49, 23 L.Ed.2d 404 (1969).

The principal question before this Court is whether the regulations at issue are an enforceable emission standard. A second question raised by the United States is whether this action is precluded by Section 307(b)(2) of the Act. I address these questions *seriatim.*

---

1. The phrase "not feasible to prescribe or enforce an emission standard" means any situation in which the Administrator determines that: "(A) a hazardous pollutant or pollutants cannot be emitted through a conveyance designed and constructed to emit or capture such pollutant, or that any requirement for, or use of, such a conveyance would be inconsistent with any Federal, State, or local law, or (b) the application of measurement methodology to a particular class of sources is not practicable due to technological or economic limitations." Clean Air Act, § 112(e)(2).

## I.

In support of its claim that the vinyl chloride relief valve regulations at issue are not enforceable emission standards, Borden relies primarily on the Supreme Court's decision in *Adamo Wrecking Co. v. United States,* 434 U.S. 275, 98 S.Ct. 566, 54 L.Ed.2d 538 (1978). The "National Emission Standard for Asbestos" at issue in *Adamo* set forth specific procedures to be followed in connection with building demolitions, but did not by its terms limit emissions of asbestos occurring during demolition. Originally, the Administrator proposed a "no visible emissions" standard for asbestos, 36 Fed.Reg. 23242 (1971), but concluded "that the no visible emission requirement would prohibit repair or demolition in many situations, since it would be impracticable, if not impossible, to do such work without creating visible emissions."[2] 38 Fed.Reg. 8821 (1973). The Administrator "chose to regulate work practices only when it became clear he could not regulate emissions." 434 U.S. at 287, 98 S.Ct. at 574. The resulting "emission standard" provides, in pertinent part:

(i) Friable asbestos materials used to insulate or fireproof any boiler, pipe or load-supporting structural member, shall be wetted and removed from any building, structure, facility, or installation subject to this paragraph before wrecking of load-supporting structural members is commenced. The friable asbestos debris shall be wetted adequately to insure that such debris remains wet during all stages

of demolition and related handling operations.

40 C.F.R. § 61.22(d)(2)(i) (1975). The Court, determining that Congress intended a quantitative limit on emissions,[3] held that the provisions which the Administrator sought to enforce were actually work practice standards, despite being labelled an "emission standard." The Court concluded that the company was being prosecuted for violation of these work practice requirements, not for emissions above a specified limit. Since these work practice standards were promulgated prior to the 1977 authorizing amendment, the Court held that they were not enforceable emission standards and ordered the case dismissed. 434 U.S. at 285–89, 98 S.Ct. at 573–75.

Borden claims that the vinyl chloride relief valve regulations at issue here contain no quantitative limits but instead "prohibit only discharges which are not 'emergency' discharges." Defendant's Memorandum at 8. Borden also claims that these regulations, "on their face permit discharges under certain conditions...." Defendant's Memorandum at 10. These attempts to bring the regulations into the ambit of *Adamo* fail. Unlike the regulations at issue in *Adamo,* which facially required specific work practices without setting a limit on asbestos emissions, the vinyl chloride relief valve regulations at issue here facially set a quantitative limit on emissions of zero. These regulations do not "permit" any discharges; all discharges are prohibited. The

---

**2.** *Compare Luckie v. Gorsuch,* No. CIV–81–573–GLO–BMB (D.Ariz. Feb. 25, 1983) (slip opinion), where a citizen's group challenged an asbestos regulation requiring "no visible emission" of asbestos fibers from any asbestos mill. The citizen's group asserted that the regulation failed to establish an "emission standard" as mandated under § 112(b). The court ruled, however, that the no visible emission requirement was a quantitative standard within the meaning of § 112(b), notwithstanding the inability to quantify violations or the absence of controls over invisible emissions.

**3.** Most clearly supportive of petitioner's position that a standard was intended to be a quantitative limit on emissions is this provision of § 112(b)(1)(B): "The administrator

shall establish any such standard *at the level* which in his judgment provides an ample margin of safety to protect the public health from such hazardous air pollutant." (Emphasis added.) All these provisions lend force to the conclusion that a standard is a quantitative "level" to be attained by use of "techniques," "controls," and "technology." This conclusion is fortified by recent amendments to the Act, by which Congress authorized the Administrator to promulgate a "design, equipment, work practice, or operation standard" when "it is not feasible to prescribe or enforce an emission standard." Clean Air Act Amendments of 1977, Pub.L. 95–95, § 110, 91 Stat. 703.
434 U.S. at 286, 98 S.Ct. at 573.

legislative history expressly acknowledged that a zero discharge limit was permissible under Section 112(b) if justified in the Administrator's expert view. S.Rep. No. 1196, 91st Cong., 2d Sess. at 20 (1970), U.S.Code Cong. & Admin.News 1970, p. 5356.

Although Congress expressed its intention that emission standards under Section 112(b) be primarily quantitative, it did not *require* that they contain purely quantitative limits. The preference for numerical emission standards was based on Congress' desire to permit industry and market forces to establish methods of compliance, instead of specifying equipment or practices that would lock industry into particular solutions. *See, e.g.,* S.Rep. No. 1196, 91st Cong., 2d Sess. at 17 (1970). The vinyl chloride relief valve regulations establish a quantitative limit on emissions of zero and no where specify work practices that prevent operators from determining how to achieve compliance. The regulations do provide a defense of impossibility of compliance [4] and set forth information to be included in a report from which the Administrator may find that the discharge was an unavoidable "emergency" and therefore excusable. The list of information to be included in the report, however, can in no way be characterized as requiring specific work practices. Under the vinyl chloride relief valve regulations, operators are not at all limited in the ways they may achieve compliance with the zero discharge standard. In contrast, even if an operator under the asbestos standards in *Adamo* had zero discharges, the regulations would still be violated if the specified "wetting" requirements were not followed.

Borden argues that, by excepting emergency discharges from the standard, the Administrator recognized that a zero emission limitation would effectively prohibit the manufacture of products containing vinyl chloride, in the same way that a no visible emissions asbestos standard in *Adamo* would have effectively prohibited repairs and demolitions. Therefore, Borden argues, the Administrator's only choice was to specify work practices as he did in *Adamo*. This argument is wholly without merit. The final regulations in *Adamo* adopted specific work practices based on the Administrator's explicit recognition that it would be impossible to do demolition work without creating visible emissions. The Administrator made no such finding with regard to the vinyl chloride regulations. To the contrary, the very premise of these regulations is that discharges on the whole are avoidable. The "no discharge" rule does not, as Borden claims, tacitly concede that discharges are a necessary part of vinyl chloride processing. Accordingly, the Administrator was free to establish a quantitative emission standard for vinyl chloride.

Borden argues that the emergency discharge exception nevertheless amounts to work practice requirements because the Administrator must determine whether the discharge could have been prevented by "taking measures." Any inquiry into whether a discharge in violation of the standard was avoidable, however, necessarily involves an inquiry into whether preventive measures were taken. All regulations necessarily contemplate that measures will be taken to achieve compliance, but a mere inquiry into whether preventive measures were taken does not amount to a requirement, as in *Adamo,* that specific measures must be taken.[5]

---

4. In addition to providing an impossibility defense, these regulations formalize the Administrator's inherent prosecutorial discretion to excuse unpreventable violations. *See, e.g., Corn Refiners Assoc., Inc. v. Costle,* 594 F.2d 1223 (8th Cir.1979) (EPA need not expressly permit unpreventable discharges under Clean Water Act because EPA can exercise prosecutorial discretion); *Marathon Oil Co. v. Environmental Protection Agency,* 564 F.2d 1253, 1272–74 (9th Cir.1977) (water permits must contain provisions that excuse "unpreventable" discharge, despite difficulty of administering the rule).

5. Borden's claim that certain EPA enforcement orders constitute "admissions" that the relief valve regulations entail work practice requirements is without merit. Enforcement orders following a violation necessarily require ordering steps to ensure compliance where a company has failed to comply on its own. The regulations themselves, however, simply require zero discharges from relief valves.

Borden cautions that "Congress ... did not empower the Administrator, after the manner of Humpty Dumpty in Through The Looking-Glass, to make a regulation an 'emission standard' by his mere designation." Defendant's Reply Brief at 3 (quoting 434 U.S. at 283, 98 S.Ct. at 572). This Court finds that the vinyl chloride relief valve regulations are a valid emission standard by virtue of their effect, not simply because the Administrator so designated them.

The United States District Court for the Middle District of Louisiana recently addressed precisely this same issue in *United States v. Ethyl Corp.*, No. 83–0120–A, (M.D.La. July 1, 1983), *appeal docketed*, No. 83–3537 (5th Cir. August 29, 1983). The court in *Ethyl* held that the vinyl chloride relief valve regulations constitute work practice regulations rather than emission standards, and granted its motion to dismiss under the authority of *Adamo.* I have reviewed the comprehensive and helpful reasoning in *Ethyl,* but, respectfully, I must disagree.

The analysis of the court in *Ethyl* centered on the emergency discharge exception and appeared not to take full account of the "no discharge mandate." The court therefore constructed the operation of the regulations as follows: "What the regulations actually say is that unavoidable discharges are those which could not have been avoided by the application of work practices." Slip Opinion at 12. The court felt that determination of that question would require it to evaluate work practices, not whether a particular quantitative limit had been violated. I believe that application of the emergency discharge exception arises only after a prima facie violation of the "no discharge" standard has occurred. Further, this exception does not change the basic question of whether the zero discharge rule was violated into a question of whether certain specific work practices were followed.

The court in *Ethyl* accepted the claim that under the vinyl chloride relief valve regulations it faced the same two choices as the defendant in *Adamo:* "It [Ethyl] may have zero emissions or it may comply with the instructions set out by the EPA in the preamble to the regulations, which describe the 'measures' required by EPA to prevent 'avoidable' discharges...." Slip opinion at 10. A comparison of the exact wording of the asbestos regulations and the vinyl chloride regulations is necessary.

The defendant in *Adamo* was required to comply only with work practice standards, regardless of emissions. The vinyl chloride regulations require only that Ethyl have *no discharges,* and do not require specific work practice standards. Furthermore, the preamble does not set out required measures to prevent discharges. It merely suggests possible control mechanisms, without requiring any, in language devoid of the specificity of the asbestos work practice requirements in *Adamo.* In fact, the preamble confirms that the regulations establish a quantitative limit of zero emissions. The preamble provides that:

A *zero emission limit* is being proposed for relief discharges which can be prevented. In most cases such discharges from reactors can be prevented by measures *including, but not limited to,* properly instrumenting the reactors to detect upset conditions, injecting chemicals to stop the polymerization reaction during upset conditions, venting the reactor contents to a gasholder during upset conditions and ultimately to a recovery system, providing employees with improved training on preventing and handling upset conditions, and utilizing a stand-by source of power. For other pieces of equipment, increasing pressure due to inert gases in the system can be relieved by manual venting to a gasholder or recovery system. The conditions which lead to discharges can also be prevented in most cases by proper handling and transfer of vinyl chloride or materials containing vinyl chloride. *Discharges which cannot be avoided by taking such preventive measures, such as those caused by natural disaster, will not be in violation of the proposed standard if* the owner or opera-

tor notifies EPA within 10 days concerning the nature and cause of the discharge. This notification provision is necessary to permit EPA to investigate the surrounding conditions and determine whether the discharge could have been prevented.

40 Fed.Reg. 59539 (December 24, 1975) (emphasis supplied).

The court in *Ethyl* interpreted the preference for quantitative standards as arising from a concern for ease of enforcement. The overriding Congressional concern, however, was to allow industry to retain flexibility in meeting the standards and to avoid constrictions on technological choices. As discussed above, the vinyl chloride regulations are consistent with the Congressional goal as they leave industry with complete discretion in meeting the discharge limit.

This Court respectfully disagrees with the focus in *Ethyl* on the emergency exception and its acceptance of *Adamo* as controlling precedent. Further, I am not convinced that the permissively worded preamble somehow implies specific work practices into the regulations. Accordingly, I do not follow the decision in *Ethyl* as controlling.

## II.

█ In the interests of completeness, this Court further finds that Borden is precluded from challenging the status of these regulations as emission standards by Section 307(b)(2) of the Act which states: "Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement." Borden's claim that the regulations are work practice standards not authorized prior to 1977 could have been raised in a petition for review under Section 307(b)(1). *South Terminal Corp. v. Environmental Protection Agency,* 504 F.2d 646, 655 (1st Cir.1974) (review under § 307(b)(1) encompasses constitutional

questions and questions of statutory authority). Since Borden presents no issue which could not have been raised within the 60 day period provided, it is precluded from challenging the regulations in this proceeding. *Lloyd A. Fry Roofing Co. v. United States Environmental Protection Agency,* 554 F.2d 885 (8th Cir.1977) (affirming dismissal of challenge on constitutional grounds to Clean Air Act implementation plan where judicial review could have been obtained under § 307(b)(1)); *Luckie v. Gorsuch,* No. CIV–81–573–GLO–RMG at 18; see *Lubrizol Corp. v. Train,* 547 F.2d 310 (6th Cir.1976) (exclusive jurisdiction for challenge to Clean Air Act regulations as beyond statutory authority lies under § 307(b)(1)).

Borden cites *Adamo* in support of the proposition that this Court may determine whether the regulations are an "emission standard" within the meaning of the Act, even though challenge was not raised in a Section 307(b)(1) proceeding. I do not believe that *Adamo* is applicable to this case. In *Adamo,* the court held that "a federal court in which a *criminal* prosecution under *§ 113(c)(1)(C)* [6] of the Clean Air Act is brought may determine whether or not the regulation which the defendant is alleged to have violated is an 'emission standard' within the meaning of the Act." 434 U.S. at 285, 98 S.Ct. at 573 (emphasis added). The court justified this limited judicial review, despite the express preclusive statute, by stressing the potential for stringent criminal penalties: "Since Congress chose to attach *these stringent* [criminal] *sanctions* to the violation of an emission standard, in contrast to the violation of various other kinds of orders that might be issued by the Administrator, it is crucial to determine whether the Administrator's mere designation of a regulation as an 'emission standard' is conclusive as to its character." 434 U.S. at 283, 98 S.Ct. at 572 (emphasis add-

---

**6.** Borden claims that "for a corporation, the 'criminal liability' which the Government regards as distinctive, see, Plaintiff's Memorandum at 18, is in fact identical to the civil liability created by the Act." Defendant's Reply Brief at 7. This is not true. Section 113(c) provides for a fine of $25,000 per day of violation *and/or imprisonment* for not more than one year. For second offenders, the penalties are increased to a fine of $50,000 per day of violation and/or imprisonment for not more than two years.

ed). In the instant case only civil penalties and injunctive relief are sought; Borden is not exposed to "the most stringent criminal liability." 434 U.S. at 283, 98 S.Ct. at 572. There is therefore no comparable reason to disregard the preclusion statute and undermine the statutory goals of prompt, centralized review in the Court of Appeals for the District of Columbia.[7] This Court is unaware of any extension of the *Adamo* inquiry to civil actions.

Mr. Justice Powell, concurring in *Adamo,* expressed concern that an affected operator failing to note the proposed regulation in the Federal Register would be forever barred from obtaining review. This concern is not present here, as Borden commented specifically on the vinyl chloride relief valve regulations without raising the present challenge. *See* Vol. 2, Standard Support and Environmental Impact Statement: Promulgated Emission Standard for Vinyl Chloride, U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, Research Triangle Park, N.C. 27711 (September, 1976). Since Borden had actual notice, due process concerns do not arise. *See Natural Resources Defense Council v. United States Environmental Protection Agency,* 673 F.2d 400, 406–07 (D.C.Cir.1982) (due process concerns arising from § 307(b)(2) preclusion have little weight where, in fact, the regulated companies are on full notice of the regulations).

Furthermore, despite its concern over exposure to stringent criminal penalties, the Court in *Adamo* expressly narrowed the permissible inquiry to "whether the regulation which the defendant is alleged to have violated is *on its face* an 'emission standard' *within the broad limits* of the congressional meaning of that term." 434 U.S. at 285, 98 S.Ct. at 573 (emphasis added). These vinyl chloride relief valve regulations, on their face, establish a quantitative limit of zero emissions without requiring specific work practices. Therefore, they constitute an enforceable "emission standard" within the broad limits of the Congressional meaning of the term and, accordingly, would pass the narrow inquiry permitted by *Adamo* in criminal actions.

### Conclusion

For the reasons set forth above, I find that the vinyl chloride relief valve regulations which the United States seeks to enforce are enforceable emission standards within the meaning of Section 112 of the Clean Air Act.[8] I further find that Borden's challenge is precluded by Section 307(b)(2) of the Act. Accordingly, defendant's motion to dismiss for failure to state a claim upon which relief can be granted is hereby DENIED.

SO ORDERED.

---

7. Allowing Borden's challenge to the regulations at this point would also undermine the integrity of the administrative rulemaking in 1976. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 553–54, 98 S.Ct. 1197, 1216–17, 55 L.Ed.2d 460 (1978) (courts should prohibit obstruction to the administrative processes by refusing to hear challenges upon grounds not presented to agency); *United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54 (1952) (objections not made during administrative hearing are waived); *Lead Industries Ass'n v. Environmental Protection Agency,* 647 F.2d 1130, 1165 (D.C.Cir.1978) (same). In 1977 Congress expressly required presentation of issues to the EPA in order to obtain judicial review under § 307(b)(1). Clean Air Act § 307(d)(7)(B). *See American Petroleum Institute v. Costle,*

665 F.2d 1176, 1190–92 (D.C.Cir.1981) (issue not raised in rulemaking is waived), *cert. denied,* 455 U.S. 1034, 102 S.Ct. 1737, 72 L.Ed.2d 152 (1982); *Lead Industries,* 647 F.2d at 1173–81 (same).

Also, the Sixth Circuit in *Lubrizol Corp.,* 547 F.2d at 315, stated: "By centralizing appeals in the District of Columbia Circuit Court within a limited time period, Congress hoped to avoid needless delays in the implementation of important national programs caused by incessant litigation and inconsistent decisions."

8. Accordingly, this Court does not reach the question of whether work practice standards promulgated as "emission standards" prior to the 1977 amendments are enforceable if not repromulgated following the 1977 and 1978 amendments.