The LUBRIZOL CORPORATION, Petitioner,

v.

ENVIRONMENTAL PROTECTION AGENCY, Respondent.

No. 75–2186.

United States Court of Appeals, District of Columbia Circuit.

Argued March 22, 1977.

Decided Aug. 12, 1977.

808

Michael Scott, Washington, D. C., with whom William D. Kramer, Washington, D. C., was on the brief, for petitioner.

Earl Salo, Atty., Dept. of Justice, Washington, D. C., with whom Peter R. Taft, Asst. Atty. Gen., Edmund B. Clark, Atty., Dept. of Justice and Paul Loizeaux, Atty., Environmental Protection Agency, Washington, D. C., were on the brief, for respondent.

Before McGOWAN, ROBINSON and WILKEY, Circuit Judges.

Opinion for the Court filed by McGOW-AN, Circuit Judge.

McGOWAN, Circuit Judge:

Section 211 of the Clean Air Act (the Act), 42 U.S.C. § 1857f–6c (1970 and Supp. V 1975), provides for the registration of, industrial reporting on, and, under certain circumstances, the regulation of trade in,

"any fuel or fuel additive." Pursuant to Section 211, the Environmental Protection Agency (EPA) propounded a set of regulations governing the registration of and reporting on "fuels and fuel additives" that applied to "[a]ll additives produced or sold for use in motor vehicle gasoline, motor vehicle diesel fuel, and/or *motor vehicle engine oil* . . . ." 40 Fed.Reg. 52,009, 52,013 (1975), *codified in* 40 C.F.R. § 79.-31(a) (1976) (emphasis added). This *petition* for review, brought by a large independent producer of motor oil additives, raises two problems: the proper forum for review of these EPA regulations, and the intended scope of the statutory terms "fuel or fuel additive."[1] Finding that this court has exclusive original jurisdiction to review these regulations, we hold that they exceed the statutory mandate of Section 211 insofar as they apply to motor oil and motor oil additives.

## I. THE STATUTORY, REGULATORY, AND FACTUAL SETTING

With respect to the environmental impact of automobiles, the Clean Air Act of 1963,[2] as amended by the Motor Vehicle Air Pollution Control Act of 1965,[3] originally directed its regulatory efforts toward controlling pollutants emitted from the tailpipes of motor vehicles. With the passage in 1967 of the Air Quality Act,[4] however, the Act also began to devote some attention to the "fuel" used in the engines of motor vehicles that might contribute to those emissions.[5] Although the 1967 revisions, then codified in Section 210 of the Act, contemplated only the registration of and limited reporting on those fuels, the Clean Air Act Amendments of 1970[6] replaced Section 210 with a new

1. Section 211(a), the registration provision, refers to "any fuel or fuel additive;" § 211(b), the reporting provision, speaks of "fuels and fuel additives;" and § 211(c), the provision authorizing regulation of commerce, refers to "any fuel or fuel additive for use in a motor vehicle or motor vehicle engine." These variations in language appear to have no significance for the resolution of this case.

2. Pub.L. No. 88–206, 77 Stat. 392 (1963).

3. Pub.L. No. 89–272, 79 Stat. 992 (1965).

4. Pub.L. No. 90–148, 81 Stat. 485 (1967).

5. The Clean Air Act, § 210, Pub.L. No. 90–148, § 2, 81 Stat. 502 (1967), *renumbered and amended,* the Clean Air Act, § 211, Pub.L. No. 91–604, §§ 8(a), 9(a), 84 Stat. 1694, 1698 (1970), *codified in* 42 U.S.C. § 1857f–6c (1970 and Supp. V 1975).

6. Pub.L. No. 91–604, 84 Stat. 1676 (1970).

section, 211, which expanded the reporting requirements and allowed the EPA, on the basis of the information filed and other data, to restrict the sale of environmentally dangerous "fuels and fuel additives."[7] In its current form, Section 211, in relevant part, reads as follows:

(a) The Administrator may by regulation designate any fuel or fuel additive and, after such date or dates as may be prescribed by him, no manufacturer or processor of any such fuel or additive may sell, offer for sale, or introduce into commerce such fuel or additive unless the Administrator has registered such fuel or additive in accordance with subsection (b) of this section.

(b)(1) For the purpose of registration of fuels and fuel additives, the Administrator shall require—

(A) the manufacturer of any fuel to notify him as to the commercial identifying name and manufacturer of any additive contained in such fuel; the range of concentration of any additive in the fuel; and the purpose-in-use of any such additive; and

(B) the manufacturer of any additive to notify him as to the chemical composition of such additive.

(2) For the purpose of registration of fuels and fuel additives, the Administrator may also require the manufacturer of any fuel or fuel additive—

(A) to conduct tests to determine potential public health effects of such fuel or additive (including, but not limited to, carcinogenic, teratogenic, or mutagenic effects), and

(B) to furnish the description of any analytical technique that can be used to detect and measure any additive in such fuel, the recommended range of concentration of such additive, and the recommended purpose-in-use of such additive, and such other information as is reasonable and necessary to determine the emissions resulting from the use of the fuel or additive contained in such fuel, the effect of such fuel or additive on the emission control performance of any vehicle or vehicle engine, or the extent to which such emissions affect the public health or welfare.

Tests under subparagraph (A) shall be conducted in conformity with test procedures and protocols established by the Administrator. The result of such tests shall not be considered confidential.

(3) Upon compliance with the provision of this subsection, including assurances that the Administrator will receive changes in the information required, the Administrator shall register such fuel or fuel additive.

(c)(1) The Administrator may, from time to time on the basis of information obtained under subsection (b) of this section or other information available to him, by regulation, control or prohibit the manufacture, introduction into commerce, offering for sale, or sale of any fuel or fuel additive for use in a motor vehicle or motor vehicle engine (A) if any emission products of such fuel or fuel additive will endanger the public health or welfare, or (B) if emission products of such fuel or fuel additive will impair to a significant degree the performance of any emission control device or system which is in general use, or which the Administrator finds has been developed to a point where in a reasonable time it would be in general use were such regulation to be promulgated.

.     .     .     .     .

(d) Any person who violates subsection (a) of this section or the regulations prescribed under subsection (c) of this section or who fails to furnish any information required by the Administrator under subsection (b) of this section shall forfeit and pay to the United States a civil penalty of $10,000 for each and every day of the continuance of such violation, which shall accrue to the United States and be recovered in a civil suit in the name of

---

**7.** Pub.L. No. 91–604, §§ 8(a), 9(a), 84 Stat. 1694, 1698, *codified in* 42 U.S.C. § 1857–6c (1970), *amended slightly,* 42 U.S.C. § 1857–6c (Supp. V 1975).

the United States, brought in the district where such person has his principal office or in any district in which he does business. The Administrator may, upon application therefor, remit or mitigate any forfeiture provided for in this subsection and he shall have authority to determine the facts upon all such applications. 42 U.S.C. § 1857f–6c (1970 and Supp. V).[8]

In part, the statutory trend, reflected in the passage of Section 211, toward regulation of materials burned in motor vehicle engines, is a necessary corollary to the Act's original focus on purification of tailpipe emissions. Tests have demonstrated the need to control certain substances that are burned in automobile engines in order to curtail their corrosive effects on the catalytic devices otherwise found most effective in purifying emissions at the tailpipe stage. *See generally International Harvester Co. v. Ruckelshaus,* 155 U.S.App.D.C. 411, 478 F.2d 615, 624–28 (1973). In addition, this statutory development reflects the increasing sophistication of scientific research into the comparative levels and types of pollutants generated by the combustion of different materials in motor vehicle engines.

Although the administrative definitions of "fuel" under both the 1967 and 1970 revisions to the Act consistently have characterized that term broadly as "any material which is capable of releasing energy or power by combustion or other physical reaction," 35 Fed.Reg. 9282 (1970), *repromulgated in* 36 Fed.Reg. 22,419 (1971), *amended in* 40 Fed.Reg. 52,009 (1975), *codified in* 40 C.F.R. § 79.2(c) (1976), the regulations promulgated under the 1967 amendments, 35 Fed.Reg. 9282, 9284 (1970), and initially repromulgated under the 1970 amendments, 36 Fed.Reg. 22,419, 22,421 (1971), only required the registration of additives to "fuels commonly or commercially known or sold as gasoline."[9] Apparently spurred by the accumulating scientific data concerning the potentially harmful effects of pollutants and corrosives caused by the combustion of motor lubricants and lubricant additives that inevitably enter the propulsion systems of motor vehicles,[10] EPA in 1974 proposed new regulations, 39 Fed.Reg. 8929 (1974), which expanded the materials subject to the registration and reporting requirements under the Act.[11] These new regulations reached additives to "motor vehicle engine oil," such as those produced by petitioner. *Id.* at 8931.

8. See *Train v. National Resources Defense Council,* 421 U.S. 60, 63–64, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975); *Lubrizol Corp. v. Train,* 547 F.2d 310, 313–15 (6th Cir. 1976), for general discussions of the legislative evolution of the Clean Air Act and especially the 1970 Amendments.

9. The Secretary of the Department of Health, Education and Welfare, who administered the Act before the 1970 amendments, first proposed the relevant regulations under the 1967 revisions in 1969, at the very time Congress was considering what became the 1970 amendments. So far as the record shows, the Senate, but not the House of Representatives, was apprised of the contents of the proposed regulations during the consideration of the 1970 amendments. *See Hearings on S. 3229, S. 3466 and S. 3546 before the Subcommittee on Air and Water Pollution of the Senate Committee on Public Works and the Senate Commerce Committee,* 91st Cong., 2d Sess. (1970), *reprinted in* Sen. Comm. on Public Works, A Legislative History of the Clean Air Amendments of 1970, at 1137 (1974).

10. This process, in which the lubricant is burned with the gasoline, is most pronounced

in older cars and ones with rotary engines because those vehicles use larger quantities of motor oil. *See* C. Begeman & J. Colucci, Polynuclear Aromatic Hydrocarbon Emissions from Automobile Engines 7 (Paper presented at the Mid-year Meeting of the Society of Automotive Engineers, Detroit, Mich., May 18–22, 1970); J. Moran, Assuring Public Health Protection as a Result of the Mobile Source Emissions Control Program 4 (Paper presented at the Automotive Engineering Congress, Detroit, Mich., Feb. 25–March 1, 1974). Both papers are reprinted in the Appendix to the Briefs at 1, 189.

11. The new regulations were proposed on March 7, 1974, a week after John B. Moran, then head of the EPA Office of Fuel Additive Registration, presented a paper at the Automotive Engineering Congress in Detroit, summarizing the findings of several studies, published between 1970 and 1973, linking motor oil and its additives to corrosives and pollutants. J. Moran, *supra* note 10. In promulgating the regulations challenged in this suit, EPA cited many of the authors discussed in the Moran paper. 40 Fed.Reg. 52,009 nn.1–4 (1975).

The regulations required producers of such additives, if they wished to sell them on or after May 7, 1976, to file registration forms at least 90 days prior to selling them, or 30 days prior to selling any new additive developed after May 7, 1976. The forms required the manufacturer to provide available information concerning the chemical composition of the additive (and methods of determining it), the chemical structure of each compound in the additive, an analytical technique for detecting the presence and measuring the concentration of the additive in a designated "fuel," the recommended uses of the additive, the mechanisms of action of the additive in the engine, the emission products and toxicity thereof of the additive, and the effects of the additive on emission control devices. 40 C.F.R. §§ 79.21, 79.31 (1976).[12]

Not surprisingly, members of the motor oil and motor oil additive industry, including petitioner, reacted unfavorably to the new regulations, arguing that they, in conjunction with the older, but until then not fully utilized, broad definition of "fuel," reached products over which the EPA had no statutory authority.[13]

Nonetheless, EPA chose to stand by "this broad definition of fuel," arguing that it coincided with a congressional intent "to grant authority encompassing all materials which might affect the emission products of combustion and thus the public health and welfare." 40 Fed.Red. 52,009 (1975). Because some lubricants and additives to them that are used in motor vehicle engines, although introduced into the combustion chamber for *lubrication* purposes, are burned and thus "might affect the emission products," EPA argued that they fall within Section 211's registration mandate. *Id.* Consequently, on November 7, 1975, EPA promulgated the regulations challenged here, which required petitioner, by February 7, 1976, to provide EPA with the specified information about the over 200 lubricant additives it desired to market on or after May 7, 1976.

Having unsuccessfully opposed the inclusion of motor oil additives in the proposed regulations, petitioner, on December 8, 1975, filed this petition to review the regulations under Section 307(b)(1) of the Act, 42 U.S.C. § 1857h-5(b)(1) (Supp. V 1975), which gives this court exclusive jurisdiction to review EPA actions "in promulgating . . . any control or prohibition under section [211, 42 U.S.C. §] 1857f-6c . . ."[14]

Approximately a month after filing this action, petitioner also filed a "parallel" complaint and motion for preliminary injunction in the District Court for the Northern District of Ohio. Although petitioner understandably felt compelled to file initially with this court under Section 307(b)(1) in order to meet that provision's 30-day filing period, it consistently has argued that original jurisdiction to review the particular regulation at issue here, dealing solely with the registration and reporting requirements of subsections (a) and (b) of 211, lies with the federal district courts under Section 10(a) of the Administrative Procedure Act, 5 U.S.C. § 702 (1970), and 28 U.S.C. § 1331 (1970). Petitioner bases this position on the

12. EPA at this time did not propose any regulations under § 211(c) of the Act controlling or prohibiting the manufacture of any fuel or fuel additives on the basis of the information supplied in the registration process. (Of course, the *failure* to register a product within the time period fixed by the EPA would result in a ban on sales of the product under § 211(a). *See* 40 C.F.R. § 79-4(b)(1) (1976)). Accordingly, the EPA regulations derive their immediate authority from the registration and reporting requirements in §§ 211(a) and 211(b).

13. The industry reaction is summarized in 40 Fed.Reg. 52,009 (1975). Indicative of the comments attacking as overbroad the definition of

"fuel" as "any material which is capable of releasing energy or power by combustion or other chemical or physical reaction" is one by Lewis C. Green, legal counsel to Edwin Cooper, Inc., a maker of petroleum additives:

"This definition is unreasonably broad. My shirt is capable of [meeting the definition], but most people do not regard it as a 'fuel.' " Letter from Lewis C. Green to T. P. Sands of Edwin Cooper, Inc. (April 16, 1974).

14. On January 8, 1976, petitioner asked this court for a stay of the regulations pending review, which was denied on January 21, 1976.

812

fact that the Section 307(b)(1) review procedure, in relevant part, applies only to "any *control or prohibition* under [section 211]." (Emphasis added). Because subsection (c) is the only part of Section 211 that explicitly grants EPA the power to "control or prohibit" the sale of fuel and fuel additives, and because that subsection was added to the Act by the 1970 amendments at the same time as Section 307(b)(1) was added but three years after the precursors of subsections (a) and (b) were enacted, petitioner argues that Congress intended Section 307(b)(1) review in this court to apply only to regulations promulgated under subsection (c) of the Act. Furthermore, prior to the 1970 amendments, the Act annexed no explicit review procedure to the registration and reporting requirements, leading petitioner to argue that then, as now, the Administrative Procedure Act and 28 U.S.C. § 1331 (1970) provided the review mechanism for regulations under those provisions.

Accepting this argument, the District Court for the Northern District of Ohio denied EPA's motion to dismiss for lack of jurisdiction and granted petitioner's motion for a preliminary injunction against enforcement of the regulations pending review. *Lubrizol Corp. v. Train,* No. C76–7 (N.D.Ohio, Feb. 3, 1976). On appeal,[15] the Sixth Circuit Court of Appeals reversed, finding that exclusive jurisdiction lay with this court to review the motor oil additive registration regulations. *The Lubrizol Corp. v. Train,* 547 F.2d 310 (6th Cir. 1976).[16]

Judge Celebrezze's opinion for the Sixth Circuit noted that Congress, in formulating the 1970 amendments, evinced considerable doubt both as to the usefulness of the Act's simple registration and reporting requirements and as to the reviewability in *any* court of regulations promulgated under those requirements. He concluded that Congress intended the 1970 revisions to

overhaul completely both the Act's provision on fuel and fuel additives and its procedure for review of administrative actions undertaken pursuant to that and other provisions in the Act. Thus, so it was said, petitioner's reliance on the pre-1970 shape of the Act was not only based on a tenuous view of the Act's implied review procedures but was also misplaced in light of the complete restructuring in 1970 of the Act's approach to fuel and fuel additives. The opinion went on to note that Congress, in its effort to bolster the regulation of fuels and additives, treated the registration and reporting requirements, which previously had served only the "amorphous function" of "insur[ing] full access to the technical information needed to evaluate the possible health hazard" of registered materials, as "an important step in [Section 211's] national program to regulate [the sale of] fuel and fuel additives." *Id.* at 314–15. Once viewed as a crucial part of a "national program," Judge Celebrezze pointed out, Section 211(a) clearly comes within the legislative intent underlying the unilateral review procedure in Section 307(b)(1). That provision, the legislative history reveals, gave exclusive review jurisdiction to this court in order to assure dispatch and uniformity in handling challenges to those EPA regulations under the Act "which are national in scope." *Id.* at 315. Finding further that the challenge pursued by petitioners raised no issues that a district court with superior factfinding ability might be more capable of resolving, the Sixth Circuit's opinion concluded that exclusive review in this court was required by Section 307(b)(1), its legislative history, and the policy of uniformity in national matters motivating it. *Id.* at 315–19. *See* Dupler & Vinnik, *Federal Environmental Litigation in 1976: The Clean Air Act,* 1 Harv.Envt'l L.Rev. 5, 24 (1976) for commentary on Judge Celebrezze's opinion.

**15.** While the appeal was pending in the Sixth Circuit, petitioner asked this court to stay its consideration of the case pending the Sixth Circuit's decision in order to avoid "duplica-

tive" proceedings. The motion was denied on May 25, 1976.

**16.** No petition for *certiorari* was filed with the Supreme Court in this case.

## II. SUBJECT MATTER JURISDICTION

■ The Sixth Circuit's decision that Section 307(b)(1), giving this court exclusive original jurisdiction to review certain EPA actions, provides the appropriate mechanism for challenges to EPA's motor oil additive registration requirement involved the same issues of law litigated by the same parties now before this court in this direct review proceeding. Accordingly, it raises the preliminary question of whether we must accord that decision *res judicata* or, at least, collateral estoppel effect on the jurisdictional issue involved in the present action. Because we find Judge Celebrezze's opinion persuasive, however, we need not decide whether the conditions necessary to such effects are present.[17]

Although we embrace the Sixth Circuit's opinion, we emphasize several factors that make review under Section 307(b)(1) especially appropriate. First, although subsection (c) alone of the parts of Section 211 explicitly gives EPA the power to control or prohibit commerce in fuels and fuel additives, registration and reporting under subsections (a) and (b) are, also by explicit reference in subsection (c), necessary preconditions to the exercise of the powers granted EPA under subsection (c).[18] Because the requirements of subsections (a) and (b) are integral parts of the controls and prohibitions to which subsection (c) explicitly refers, the reference in Section 307(1)(b) to controls and prohibitions "under section 1857f–6c of this title," that is, under *all* of Section 211, was not imprecise drafting but a recognition of the fact that the entire section, in all three of its subparts, embodies a unitary process of imposing controls or prohibitions that deserves a unitary review procedure.[19]

---

**17.** Deciding whether the Sixth Circuit's decision has a "technical" *res judicata* or collateral estoppel effect, *see Spilker v. Hankin,* 88 U.S. App.D.C. 206, 188 F.2d 35 (1951), would necessitate deciding whether, for example, this petition for review of the EPA motor oil additive registration regulations under § 307(b)(1) of the Clean Air Act and the "parallel" complaint filed in the Northern District of Ohio seeking review of those regulations under § 10 of the Administrative Procedure Act involve the "same claim," *see* Restatement (Second) of Judgments, § 48.1, Comment b, Illustration 1 (Tent. Draft No. 1 1973); *accord id.* § 68, comment b, Illustration 3, and, if not, whether this action involves solely a matter of law as well as issues that are not "substantially unrelated," *id.* § 68.1(b); *Hadge v. Second Fed. Sav. & Loan Ass'n,* 409 F.2d 1254 (1st Cir. 1969), and, again if not, whether "there is a clear and convincing need for a new determination of the issue (i) because of the potential adverse impact of the determination on the public interest . . . ," Restatement (Second) of Judgments, *supra* § 68.1(e); *accord* 1B Moore's Federal Practice ¶ 0.405[11] (2d ed. 1974), and, finally, whether the countervailing policy against a court reaching the merits in a case in which it is not sure it has jurisdiction, *see* 1 *id.* ¶ 0.60[4], at 628–31; 2A *id.* 12.23, should overcome the finality policy underlying the doctrine of *res judicata. See* 1B *id.* ¶ 0.405[11]; *cf. United States ex rel. Celanese Coating Co. v. Gullard,* 504 F.2d 466 (9th Cir. 1974) (*res judicata* as to merits will not prevent challenge to decision by subsequent motion raising lack of jurisdiction).

An even more complicated question arises from the possibility that this court, by reaching the merits of (and denying) petitioner's motion for a preliminary stay against enforcement of the EPA regulations in question here, *see* note 14 *supra,* implicitly decided the jurisdiction question in favor of the applicability of § 307(b)(1). In that case, the jurisdictional question would be *res judicata,* although by force of *this* court's, rather than the Sixth Circuit's, earlier decision. *See* 7 Moore's Federal Practice, *supra* ¶ 60.25[2], at 306.

**18.** Subsection (c) authorizes the EPA, "on the basis of information obtained under subsection (b) of this section . . . by regulation, [to] control, or prohibit the manufacture . . . of any [environmentally dangerous] fuel or fuel additive for use in a motor vehicle . . . ." By explicitly referring to subsection (b), subsection (c) also implicitly refers to subsection (a), for no manufacturer need file the data required by (b) unless it is also required to register by (a).

**19.** *Accord International Harvester Co. v. Ruckelshaus,* 155 U.S.App.D.C. 411, 478 F.2d 615, 640 (1973). This case involved, *inter alia,* a challenge by a maker of light weight trucks to EPA's refusal to suspend, under a procedure set forth in § 202(b)(5)(D) of the Clean Air Act, 42 U.S.C. § 1857f–1(b)(5)(D), *now codified in* § 1857f–1(b)(5)(C) (Supp. V 1975), certain exhaust emissions standards for "light duty vehicles." Basing our jurisdiction on § 307(1)(b), also at issue in the present case, which gives this court exclusive original jurisdiction to review "any determination under [§ 202(b)(5)]," we first examined the validity of the EPA regulation applying the statutory emission stan-

Moreover, as Judge Celebrezze noted, by requiring a seller of additives to register and report on certain information at the risk of severe fines for noncompliance, *see* § 211(d), 42 U.S.C. § 1857f–6c(d) (Supp. V 1975), subsections (a) and (b), and the EPA regulations implementing them, act as a "control" on the product. 547 F.2d at 316 n. 24. Similarly, by denying manufacturers the ability to sell unregistered products covered by the Act, subsection (a), and EPA regulations implementing it, act as a "prohibition" on the sale of unregistered products. Thus, subsections (a) and (b) are not only integral parts of the controls and prohibitions mentioned in subsection (c), but they also embody—and authorize the EPA to carry out—independent controls and prohibitions.

Finally, the weakness of petitioner's jurisdictional contention is manifest in the irrational parsing, for purposes of review, to which it would subject the reporting requirement of Section 211(b). The 1970 amendments not only added Sections 211(c) and 307(b)(1) to the Act but also added a third paragraph to the reporting requirement which was then recodified in Section 211(b). *See* Clean Air Act § 211(b)(2), 42 U.S.C. § 1857f–6c(b)(2) (1970). Under petitioner's logic, an EPA regulation based upon the older parts of Section 211, for example the one requiring notification of the concentration of the additive in a fuel,

*see* § 211(b)(1)(A), 42 U.S.C. § 1857f–6c(b)(1)(A) (1970); 40 C.F.R. § 79.11(c) (1976), would be reviewable in the district courts under the Administrative Procedure Act standard, but a regulation, *see, e. g.,* 40 C.F.R. § 79.21(c) (1976), under the newer statutory provision, Section 211(b)(2)(B), 42 U.S.C. § 1857f–6c(b)(2)(B) 1970, requiring information as to the analytical technique used to determine that concentration would be reviewable exclusively in this court under Section 307(b)(1). As Judge Celebrezze reasoned with respect to the less disruptive separation for review purposes of Sections 211(a)–(b) from Section 211(c), this dissection of Section 211(b) "would undermine the policies [of national uniformity and administrative dispatch that] Congress sought to achieve by enacting Section 307(b)(1)." 547 F.2d at 317.

The case that petitioner primarily relies upon by analogy to support the opposite conclusion actually accords with Judge Celebrezze's decision. In *Natural Resources Defense Council v. Train,* 171 U.S.App.D.C. 151, 519 F.2d 287 (1975), the appellant challenged the failure of EPA to include several allegedly toxic pollutants on a list of such substances that Section 307(a) of the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. § 1317(a) (Supp. V 1975), requires EPA to publish. Under Sections 307(a)(2) and 307(a)(6) of FWPCA, EPA, within es-

dards for "light duty vehicles" to light weight trucks not primarily used as passenger vehicles. Although the definition of "light duty vehicles" is not explicitly a "determination under" § 202(b)(5), which authorizes suspension of emission standards, Judge Leventhal justified this court's jurisdiction to review the definition "because the validity of the [definitional] regulation is a premise of the refusal to grant suspension." 478 F.2d at 640. In the present case, the validity of the definition of "fuel" pursuant to the registration and reporting requirements in §§ 211(a) and 211(b) is likewise a premise of EPA's power to control or prohibit commerce in certain fuels and additives to them under Section 211(c), and § 307(1)(b)'s review procedure for § 211(c) likewise should apply in reviewing the regulations under the threshold requirements in §§ 211(a) and 211(b).

Petitioner relies on dicta in the opinion suggesting that "the [definitional] regulation [also] could be challenged in a separate proceeding in the District Court." 478 F.2d at 640. This language has little relevance to the present case. Unlike § 211, which uses the term "fuel" in a step-by-step process leading to the unitary goal of controlling or prohibiting trade in fuels that have dangerous effects on emissions, § 202 applies the phrase "light duty vehicles" to several distinct processes of developing, implementing, and suspending increasingly strict emissions standards for different years. Furthermore, § 307(b)(1) explicitly makes some of § 202's processes reviewable by this court and it explicitly removes some of them from this court's original review jurisdiction. Hence, the dicta in *International Harvester* suggesting that there is concurrent jurisdiction to review the definition of "light duty vehicles" in § 202 reflects the multiple regulatory processes of which that phrase is a premise, in contrast to the unitary regulatory process of which the phrase "fuel or fuel additive" in § 211 is a premise.

tablished time periods after such listing, must propose and effectuate effluent standards or prohibitions governing the listed substance. Section 509(b)(1) of the Act, 33 U.S.C. § 1369(b)(1) (Supp. V 1975), then gives all federal courts of appeals jurisdiction to review any action "in promulgating any effluent standard, [or] prohibition . . . ."

Petitioner in the present case attempts to rely on the decision in *NRDC v. Train* because it held that Section 509(b)(1) did not give this court, but instead allowed district court, jurisdiction to review EPA's refusal to list a substance and thus, ultimately, its refusal to issue effluent standards regarding it. Nonetheless, Judge Robb, writing for the court in the case, noted that

> when the Administrator *has* listed a substance and thereafter promulgated standards or prohibitions for that substance *the listing and the promulgation of standards are interwoven* ; any challenge to the Administrator's action must then be in a court of appeals under Section 509 which provides for review of the Administrator's action "in promulgating any effluent standard [or] prohibition." *Id.* at 290–91 (emphasis added).

This hypothetical case put by Judge Robb obviously adheres much more closely to the facts of the present case than do the actual facts of *NRDC v. Train.* Here, EPA *has* required registration of certain substances, which action, because it is "interwoven" with the process of imposing controls and prohibitions as to such substances, should come within the review procedure established for those controls and prohibitions.

In sum, petitioner has failed to persuade us that we should not accept Judge Celebrezze's analysis in *The Lubrizol Corp. v.*

*Train, supra,* concluding that the District of Columbia Circuit is the appropriate forum for reviewing EPA's regulation that includes motor oil additives within its definition of "fuel and fuel additives." Accordingly, we turn to the question of the validity of that regulation.

## III. THE VALIDITY OF THE EPA REGULATIONS

Section 211 authorizes the registration of "any fuel or fuel additive." Petitioner assails the EPA regulation, 40 C.F.R. § 79.31(a) (1976), that purports to find authority in Section 211 for a requirement that motor oil additives be registered. Because petitioner does not deny that its products are "additives," its challenge goes to EPA's characterization of motor oil as a "fuel" within the meaning of Section 211. Although the regulations never make that characterization explicit, they imply it in Section 79.31(a)'s application to "additives produced or sold for use in . . . motor vehicle engine oil." Moreover, the comments announcing the promulgation of the regulations justify the "designation of engine oils for registration" because such oils fall within EPA's admittedly "broad definition" in 40 C.F.R. § 79.2(c) of "fuel" as any material capable of releasing energy. 40 Fed.Reg. 52,009 (1975). Consequently, although this court need not develop a detailed definition of "fuel" under the Clean Air Act, it must conceive of that definition distinctly enough to determine if motor oil falls within it. If it does not, the regulations are "in excess of statutory . . . authority . . . ." and invalid. Administrative Procedure Act, § 10(e)(2)(c), 5 U.S.C. § 706(2)(C) (1970).[20]

---

**20.** In addition to § 211, EPA cited § 301(a) of the Act, 42 U.S.C. § 1857g (Supp. V 1975), as authority for the regulations. That provision gives EPA the power "to prescribe such regulations as are necessary to carry out [its] functions under this Act." Because § 211 defines the relevant "functions" of EPA, however, that section alone is the source of the "statutory . . . authority" at issue in this case.

*Dupont v. Train,* 430 U.S. 122, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977) and *Sierra Club v. EPA,*

176 U.S.App.D.C. 335, 540 F.2d 1114 (1976) (appeal pending), are not to the contrary. In the former case, the Supreme Court carefully analyzed the language of several specific statutory grants of authority to determine the "functions" that EPA was given general regulatory power to achieve by § 501(a) of the Federal Water Pollution Control Act Amendments, 33 U.S.C. § 1361(a) (Supp. V 1975), which parallels the language of § 301 of the Clean Air Act. 430 U.S. at 126, 135, 97 S.Ct. at 974–978. In

This litigation has identified three general approaches to such a definition. The first, of course, is reflected in the "broad" definition in Section 79–2(c) of the EPA regulations. Its primary focus is on the capability of a substance to produce energy by chemical or physical reaction and, as such, it encompasses virtually all known organic and many inorganic substances. Perhaps because of the potentially absurd implications of this first approach, *see* note 13 *supra*, EPA actually has relied in this litigation and in promulgating the regulations in question on a second—and policy-oriented—definitional tack. This approach identifies Section 211's purpose in regulating "fuels and fuel additives" as being the prevention of toxic and corrosive motor vehicle emissions, and then seeks to define anything as a fuel or additive if it might create such emissions.[21] This definition includes at least any substance that is burned in the combustion chamber of the gasoline and diesel engines used in most motor vehicles currently in service.[22]

The third definitional approach, advocated by petitioner, looks to an assertedly common sense understanding of the word "fuel" as the substances used to *propel* motor vehicles—chiefly gasoline, but also diesel fuel and perhaps other substances. This approach is exemplified by the definition of "fuel" in Webster's Third New International Dictionary 918 (1971), as "[a] material . . . *used to* produce heat or power by burning." (Emphasis added).

■ Generally, courts accord statutory language its common sense meaning unless the statute, or its legislative history, require some other reading. *E. g., Addison v. Holly Hill Co.*, 322 U.S. 607, 618, 64 S.Ct. 1215, 1221, 88 L.Ed. 1488 (1944) ("After all, legislation when not expressed in technical terms is addressed to the common run of men and is therefore to be understood according to the sense of the thing, as the ordinary man has a right to rely on ordinary words addressed to him."),[23] *Williams*

*Sierra Club, supra,* the interpretation of § 110(a)(2) of the Clean Air Act, 42 U.S.C. § 1857c–5(a)(2) (1970), in light of the Act's broad purpose, expressed in § 101(b), 42 U.S.C. § 1857(b)(1) (1970), was prompted by the fact that § 110(a)(2) otherwise would "be in conflict with the congressional purpose expressed in the act" and with the "clear understanding" of the legislative history of the Act. 540 F.2d at 1124. Although in the present case, § 211, if restricted to propellants, might not *fully* achieve the Act's purposes, neither would it *conflict* with those purposes or with the Act's legislative history.

21. *See, e. g.,* 40 Fed.Reg. 52,009 (1975), arguing that Section 211 evidences a congressional intent "to grant authority encompassing all materials which might affect the emission products of combustion and thus the public health and welfare."

22. As noted earlier, a portion of the lubricants introduced into the combustion chamber is burned up during the combustion process. *See* note 10 *supra* and accompanying text.

23. Neither of the parties contend that § 211 uses "fuel" in a "technical" manner. Even if § 211 did so, however, it would not encourage us to deviate from the "common sense" approach to that term's definition, because its technical meaning coincides with its common sense meaning. The Supreme Court has identified those people who are familiar with "the field," or "the art or science" being regulated,

as proper sources for the meaning of words that the legislative history indicates are used technically by the statute. *NLRB v. Highland Park Manufacturing Co.,* 341 U.S. 322, 326, 71 S.Ct. 758, 95 L.Ed. 969 (1951). (Frankfurter, J., dissenting); *Corning Glass Works v. Brennan,* 417 U.S. 188, 201–02, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). As noted above, the reaction by members of the fuel and motor oil industries to the EPA regulations in question uniformly condemned both the broad, capability-based definition of fuel and the policy-oriented justification for requiring registration of motor oil and its additives. These sources advanced a variety of alternative definitions, all of which, however, fell within the "common sense" approach referred to above. *See* Appendix to the Briefs at 209–72.

EPA officials also potentially qualify as persons familiar with the "field" in question here. In this case, however, their defense of the regulations has not drawn on that familiarity or on their technical expertise, but instead has focused on their understanding of the intent and purpose of Congress in drafting § 211. *See, e. g.,* 40 Fed.Reg. 52,009 (1975); Brief for Respondent at 15–41. As such, the agency's definition of "fuel" carries little impact as an indicium of the term's "technical meaning" and is due less of the deference that courts traditionally accord an administrator when the issues in question have a technical or industrial rather than legal hue. *Texas Gas Transmission Corp. v. Shell Oil Co.,* 363 U.S. 263, 270, 80 S.Ct. 1122, 4

*v. W.M.A. Transit Co.,* 153 U.S.App.D.C. 183, 472 F.2d 1258, 1265 (1972). Nothing in the language of Section 211 suggests a congressional intent to address any persons other than "the common run of men" in using the term "fuel." Hence, we must turn to the legislative history of Section 211 in search of possible justifications for reading the term more broadly than it ordinarily would be read.

The legislative record surrounding Section 211 contains only one explicit reference to motor oils and none to motor oil additives. In the one reference to engine oil, Representative Satterfield of Virginia was questioning Dr. John T. Middleton of the National Air Pollution Control Administration before the Subcommittee on Public Health and Welfare of the House Committee on Interstate and Foreign Commerce, which was considering the 1970 amendments. Having established that "[t]here are many factors that contribute to" emissions and that "fuel is only one of the factors," Congressman Satterfield continued:

> It is my understanding, . . . that you get emissions from gasoline engines in several places. There is your fuel system, where the volitability of your fuel might create emissions, you have them in your internal parts of your engine, in the crank case, and then you have them in the exhaust. I understand this can be affected not only by the contents of the fuel itself, but more importantly the parameters of the engine and what occurs within an individual engine; is this correct?
>
> DR. MIDDLETON: Yes, it is very true, the nature of the combustion chamber, the additives used in fuels, their impact

upon the collection of debris in the engine and the oil to facilitate the valves operating properly and let us not overlook the way in which people drive their cars and particularly the way garages maintain, or not, their cars.

The parties, *see* Brief for Petitioner at 28–29; Brief for Respondent at 30, seem to agree that Dr. Middleton's statement is ambiguous: It may attribute emissions to the lubricating oil itself or it may link them to the effect of fuel additives (and perhaps the nature of the combustion chamber) *on* that oil (as well as on the engine debris). Two things are clear from this exchange, however: Some members of Congress were aware first that motor oils (but apparently not motor oil additives)—"in the crank case" or in the engine—may have a more or less direct impact on emissions, and second, that several other distinct "factors" also have such an impact, including not only "fuel" and "the additives used in fuel," but also "the parameters of the engine," the "debris in the engine," "the way in which people drive" and "the way garages maintain . . . cars."

Although the parties have expended considerable effort in argument as to whether motor oil and its additives *do* have negative effects on emissions and, if so, whether Congress knew of those effects, *see* Brief for Petitioner at 27–29; Brief for Respondent at 15–28; Reply Brief for Petitioner at 20–24, the more important question seems to us to be whether, in drafting Section 211, the legislators intended to reach *all* of the factors, including motor oil and its additives, that they knew *might* have such an effect. The discussion between Representa-

L.Ed.2d 1208 (1960); *Wilderness Soc'y v. Morton,* 156 U.S.App.D.C. 121, 479 F.2d 842, 864–66, *cert denied,* 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973); K. Davis, Administrative Law Text § 30.06, at 552–53 (3d ed. 1972). Because this petition presents a question of statutory interpretation over which the Courts have "primary responsibility," *Zuber v. Allen,* 396 U.S. 168, 193, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969), because the statutory language in question is not facially ambiguous, *see Shea v. Vialpando,* 416 U.S. 251, 262 n.11, 94 S.Ct. 1746, 40

L.Ed.2d 120 (1974), and because Congress cannot be charged with acquiescence in the recent administrative application of § 211 to motor oil and motor oil additives, *see* note 9 *supra* and accompanying text, the justification for judicial deference to administrative action appears especially weak in this case. *See Wilderness Soc'y v. Morton, supra* at 866–70; *National Petroleum Refiners Ass'n v. FTC,* 157 U.S.App. D.C. 83, 482 F.2d 672, 695 (1973), *cert. denied,* 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974).

tive Satterfield and Dr. Middleton suggests that some members of Congress, at least, distinguished "fuel" and "fuel additives" from several other factors, including motor oils, that might contribute to emissions. That these same members of Congress did not object to the confinement of Section 211 to "any fuel or fuel additive" suggests that they did not expect that section to reach many potential causes of pollution, including motor oils and motor oil additives.

■ The Satterfield-Middleton exchange accordingly reveals the weakness of EPA's policy approach to the definition of "fuel." In light of the various "factors" identified during that exchange, that approach, by granting the agency authority to reach any potential contributor to emissions—or at least any that was known to Congress in 1970—would allow it to regulate the design of (and materials used in building) engines, substances likely to find their way into engine debris (for example, the materials used to construct gas station pumps and gasoline tanks) as well as methods of auto maintenance and driving techniques.[24] Clearly,

Congress did not intend, by its use of the term "fuel," to authorize EPA to regulate those emissions factors, despite the consistency of such regulation with the Act's purposes. Without more proof than inheres in the statutory language and purposes, therefore, neither can we see any basis for extending the term "fuel" to cover motor oil and motor oil additives.[25]

The other references to fuel in the legislative history of Section 211 do not provide the necessary proof that "fuel" means more in the Clean Air Act than it does in common parlance. Instead, those references show a marked tendency of the legislators debating the provision to use "fuel" and "gasoline" interchangeably. E. g., 116 Cong.Rec. 19,-206–07 (1970) (remarks of Rep. Springer); id. at 19,207 (remarks of Rep. Reid); id. at 19,210 (remarks of Rep. Rogers); id. at 19,-231 (remarks of Rep. Satterfield).

Because these identifications of fuel with gasoline occurred in discussions of the proper regulatory approach to lead in gasoline, they are not conclusive as to the full mean-

24. In its brief and in oral argument, EPA has put considerable emphasis on a passage in the Senate Conferees' Summary of the Provisions of the Conference Agreement stating that "the concept of a control or prohibition should be taken to include requiring design changes in motor vehicles, as well as fuel handling equipment . . ." *Reprinted in* Sen. Comm. on Public Works, A Legislative History of the Clean Air Amendments of 1970, at 135 (1974). Although it could be read more broadly, this statement appears only to allow EPA, *in regulating the contents of fuel,* for example gasoline lead, to require that fuel tanks in automobiles and fuel pumps in service stations be fitted specially, for example to prevent the use of leaded gasoline in those automobiles. Such a requirement, however, would affect motor vehicle design only as a necessary offshoot of the regulation of fuel content, and would not regulate that design because of any impact on emissions that it has independently of the fuel.

25. The Satterfield-Middleton dialogue thus reveals why, in this case, the legislative policy behind § 211 is not an accurate indicator of the reach of the provision's relatively narrow language. More general support for that conclusion is found in the Supreme Court's approach to statutory construction in light of statutory policy. Although the Supreme Court advocates consideration of legislative purpose when there is some reason to mistrust the common

sense understanding of the statutory language, it cautions against relying on policy in the event that the "commonly accepted meaning" is clear and the presumption in favor of its use is not rebutted by the statute or its legislative history. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 198–99, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *see Mobil Oil Corp. v. FPC,* 149 U.S. App.D.C. 310, 463 F.2d 256, 263, *cert. denied,* 406 U.S. 976, 92 S.Ct. 2409, 32 L.Ed.2d 676, *reh. denied,* 409 U.S. 902, 93 S.Ct. 100, 34 L.Ed.2d 165 (1972). The cases cited by EPA accord with this principle. *E. g., United States v. Southwestern Cable Co.,* 392 U.S. 157, 173–75, 177–78, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968) (FCC may regulate "community antenna television" systems that fall within the purpose but not so clearly within the language of the Communications Act, because the Act accords that agency broad and amorphous powers over the entire communications field); *United States v. An Article of Drug . . . Bacto-Unidisk,* 394 U.S. 784, 89 S.Ct. 1410, 1418, 22 L.Ed.2d 726 (1969) ("The historical expansion of the definition of drug, . . . clearly show[s], we think, that Congress fully intended that the Act's coverage be as broad as its literal language indicates—and equally clearly, broader than any strict medical definition might otherwise allow.").

ing of "fuel." They do indicate, however, Congress' major concern in passing the section, and, as a general matter, such evidence from the legislative history is due considerable weight in statutory interpretation. Thus, in a closely analogous situation arising under Section 202 of the Clean Air Act, 42 U.S.C. § 1857f–1 (1970 and Supp. V 1975), a panel of this court held that the statutory phrase "light duty vehicle" meant "passenger cars," because legislators debating that provision had freely substituted the two phrases. *International Harvester Co. v. Ruckelshaus,* 155 U.S.App.D.C. 411, 478 F.2d 615, 639 (1973). As Judge Leventhal noted, "[t]his kind of legislative intent must be given priority, in interpreting this law, over any presumption of continuance of prior administrative definitions of this term or to the policy of upholding reasonable interpretations of statutes by administrative agencies in the absence of other discernable legislative intent," *id.* (footnotes and citations omitted), and, we would add, such legislative history also deserves priority over the canons of construction advocating dependence on the broad purposes of an act and favoring expansive interpretation of remedial legislation.

In short, EPA has not persuaded us that Congress meant anything more than it said in Section 211, that is to say, EPA may require the registration of, and ultimately may regulate commerce in, those motor vehicle *propellants* and additives to them that may contribute to harmful tailpipe emissions. What EPA *has* shown is that studies completed in the years since Congress enacted Section 211 indicate that *lubricants* and additives to them may have effects on emissions similar to those of propellants and propellant additives, and that those effects are potentially harmful enough, as a *policy matter,* to warrant regulation of such lubricants and additives similar to that imposed on propellants by Section 211.[26] Yet that showing by itself is not sufficient to prompt us to substitute the agency's albeit well meaning interpretation for the clear language that Congress wrote into the statute. *Accord, Mobil Oil Corp. v. FPC,* 149 U.S. App.D.C. 310, 463 F.2d 256, 263, *cert. denied,* 406 U.S. 976, 92 S.Ct. 2409, 32 L.Ed.2d 676, *reh. denied,* 409 U.S. 902, 93 S.Ct. 100, 34 L.Ed.2d 165 (1972). In a period of seemingly growing popular conviction that government agencies too often transgress the statutorily imposed boundaries of their authority,[27] courts, in reviewing administrative action, must be alert to confine that action within those boundaries. Having amassed a body of data on the potentially harmful effects on air quality of motor oils and additives, and being in a position to urge with some force the consistency of requiring their registration with the purposes of the Act, EPA remains free to

26. Some evidence of motor oil's impact on emissions was available to members of Congress during their consideration of Section 211 and the 1970 amendments. See the discussion of the Satterfield-Middleton dialogue *supra.* Nonetheless, the bulk of the systematic research data on that effect, as well as *all* of the data on the effect of motor oil additives, arose *after* Congress passed the amendment in late 1970. Thus, of the eight studies cited by EPA in promulgating these regulations, 40 C.F.R. 52,009 (1975), and in its Brief, at pp. 24–28, only one was completed early enough to have an impact on the legislation, *see* C. Begeman & J. Colucci, *supra* note 10, and it dealt solely with pollutants produced when motor oil is burned and did not presage the findings, emphasized in most later studies, that motor oil *additives* could corrode catalytic converters.

Even EPA waited three and a half years after § 211 became law before it decided, on the basis of "'evidence in the literature [showing]

that lubricant composition and additive materials influence exhaust composition," to institute a registration program for motor oil additives. 40 Fed.Reg. 52,009 (1975); *see* 30 Fed.Reg. 8924 (1974). *See also* note 12 *supra* and accompanying text.

27. The most tangible evidence of this conviction is the current legislative effort to give one house of Congress power to veto any regulation promulgated by a federal agency. *E. g.,* H.R. 1487, 95th Cong., 1st Sess. §§ 601–08 (1977). EPA has opposed such legislation. *Administrative Procedure Act Amendments of 1976, Hearings before the Subcommittee on Administrative Practice and Procedure of the Committee on the Judiciary,* 94th Cong., 2d Sess. 340–45 (1976) (Statement of Robert V. Zener, General Counsel to EPA, before the Subcommittee on Administrative Law and Governmental Relations of the House Committee on the Judiciary, Oct. 30, 1975).

present to *Congress* its arguably persuasive case for an amendment to Section 211. But for *this Court* to countenance what, on the record before us, is essentially an amendment by regulation would constitute an unwarranted judicial intrusion upon the legislative sphere wholly at odds with the democratic processes of lawmaking contemplated by the Constitution.

Accordingly, we invalidate the regulations in Part 79 of Title 40 of the Code of Federal Regulations insofar as they apply to motor oil and motor oil additives.

*It is so ordered.*