United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued December 4, 1998 Decided February 19, 1999 

 No. 97-1737

 Harbor Gateway Commercial Property 

 Owners' Association, et al., 

 Petitioners

 v.

 United States Environmental Protection Agency, 

 Respondent

On Petition for Review of an Order of the 
Environmental Protection Agency

 Albert M. Cohen argued the cause and filed the briefs for 
petitioners.

 H. Michael Semler, Attorney, United States Department of 
Justice, argued the cause for respondent. With him on the 
brief was Lois J. Schiffer, Assistant Attorney General. Eric 
G. Hostetler, Attorney, entered an appearance.


 Before: Wald, Silberman and Sentelle, Circuit Judges.

 Opinion for the court filed by Circuit Judge Sentelle.

 Dissenting opinion filed by Circuit Judge Wald.

 Sentelle, Circuit Judge: Petitioners challenge the Envi-
ronmental Protection Agency's 1997 listing of the "Del Amo" 
site in Los Angeles, California, on the National Priorities List 
("NPL"), arguing, inter alia, that EPA's 1996 proposal to list 
the Del Amo site was invalid because EPA violated the 
Omnibus Consolidated Rescissions and Appropriations Act of 
1996 by proposing the site for listing based on a letter from 
California's environmental agency rather than a written re-
quest from the Governor as required by the Act. Because we 
agree with petitioners that EPA did not obtain the required 
written authorization from the governor, we conclude that the 
proposal, and hence the listing, were invalid, and therefore do 
not reach petitioners' other arguments.

 I.

 The "Del Amo" site is located in Los Angeles, and was 
occupied by a complex of rubber plants from the 1940's 
through the 1960's. During that time, residues were disposed 
of in pits located at the southern end of the plant, and other 
wastes were deposited in a series of evaporation ponds adja-
cent to the pits. The pits and ponds are separated from the 
remainder of the property by a 200-foot Department of 
Water and Power right-of-way. In 1972, a real estate develop-
er purchased the land, demolished the rubber plant, and 
began constructing an industrial park and office complexes on 
the land north of the right-of-way. Petitioners are current 
owners and/or occupiers of this land north of the right-of-way, 
over two hundred acres of which now comprise industrial 
park and office complexes, known collectively as Harbor 
Gateway Centers. Their property does not include the pit 
area.

 Investigations of possible environmental hazards at the site 
have been going on for some time. In 1981, the California 
Department of Toxic Substances Control learned of the pits 

and ponds, and soon thereafter, the area occupied by the pits 
and ponds was listed on the state's Superfund list. In 1991, 
EPA proposed that the "Del Amo Facility" be placed on the 
National Priorities List, a list of releases EPA determines 
present the greatest danger to public health or the environ-
ment. See Comprehensive Environmental Response, Com-
pensation and Liability Act of 1980, s 105, 42 U.S.C. s 9605. 
EPA did not list the area based on this initial 1991 proposal. 
In 1993, EPA proposed to change the name of the "Del Amo 
Facility" to the "Del Amo Pits" to more accurately reflect the 
site, 58 Fed. Reg. 27,507, 27,511, but no final action was 
taken.

 In 1996, EPA proposed to add the area to the National 
Priorities List as the "Del Amo" site. The proposal did not 
specify whether the site would include the pit and pond area 
only, or areas north of the right-of-way as well, and noted 
that "the listing process itself is not intended to define or 
reflect the boundaries" of any release. 61 Fed. Reg. 30,575, 
30,576. The listing proposal was based on the site's score 
under EPA's "Hazard Ranking System," a model which is 
utilized for ranking sites for possible listing on the NPL. 40 
C.F.R. pt. 300, app. A. The Hazard Ranking System regula-
tions allow EPA to evaluate up to four separate exposure 
pathways for each site (groundwater, soil, surface water, air). 
Id. at s 2.1. The Del Amo site's score was based on the 
threat chemicals including benzene and hydrogen sulfide 
posed for the groundwater migration pathway. Comments 
objected to the use of hydrogen sulfide in the scoring, arguing 
that it had never been considered a threat to the groundwa-
ter. Comments also objected to EPA's use of the "Del Amo" 
name rather than the more specific "Del Amo Pits," since 
EPA had indicated in 1993 that the latter name accurately 
reflected the site. Finally, comments argued that the propos-
al was invalid because the EPA had not received a written 
request from the Governor to propose the site as the then-in-
force Appropriations Act required, but had instead acted 
upon a written request from the state environmental agency.

 On September 25, 1997, EPA listed the Del Amo Site on 
the NPL. 62 Fed. Reg. 50,442. EPA defended its use of 


hydrogen sulfide in scoring the site, noting that the ranking 
was entirely consistent with the method described in the 
Hazard Ranking System. EPA declined to change the site 
name from "Del Amo" to "Del Amo Pits," noting that it did 
not have sufficient data to explicitly define the limits of the 
site at that time. EPA also defended its acting without a 
letter directly from the Governor, since it did have a letter 
"on behalf of the Wilson administration" from California's 
environmental agency. See Support Document for the Re-
vised National Priorities List Final Rule--September 1997.

 Petitioners challenge the 1997 listing on several of the 
grounds raised in the comments, including EPA's use of 
hydrogen sulfide in scoring the site, the use of the name "Del 
Amo" rather than the more limited "Del Amo Pits," and the 
failure to obtain a written request from California's governor 
before proposing the listing of the site. We find the third 
argument dispositive, and do not address the first two.

 II.

 The Omnibus Consolidated Rescissions and Appropriations 
Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321-297 to 299 
(1996) ("Appropriations Act"), included a section regarding 
funding to carry out the Comprehensive Environmental Re-
sponse, Compensation and Liability Act of 1980 (CERCLA). 
That section provided that

 none of the funds made available under this heading may 
 be used by the Environmental Protection Agency to 
 propose for listing or to list any additional facilities on 
 the National Priorities List ... unless the Administrator 
 receives a written request to propose for listing or to list 
 a facility from the Governor of the State in which the 
 facility is located, or unless legislation to reauthorize 
 CERCLA is enacted.

110 Stat. 1321-298.

 The provisions of the Appropriations Act were in force at 
the time EPA sought to propose listing of the Del Amo site. 

Accordingly, EPA, in a letter of May 24, 1996, contacted the 
deputy director of the California Department of Toxic Sub-
stances Control (DTSC) and explained what the Appropria-
tions Act required with regard to the proposal to list the Del 
Amo site. The letter from EPA explained that the Appropri-
ations Act "contained very specific language that requires 
EPA to obtain a letter from the Governor requesting the 
listing, or that the Governor submit a letter delegating the 
authority to request placement of sites on the NPL to the 
appropriate State official." EPA included with its letter to 
DTSC examples of letters from other States, including both a 
letter from a governor requesting listing of a site, and a letter 
from a governor authorizing the state environmental agency 
to act on the governor's behalf. EPA's letter further noted 
that the deadline for the letter regarding Del Amo was May 
28, 1996. In response, in a letter dated May 30, 1996, DTSC 
deputy director Paul D. Blais wrote that "[DTSC], on behalf 
of the Wilson Administration, concurs with your agency's 
proposal to list the Del Amo Superfund site on the National 
Priority [sic] List." EPA responded by letter dated May 31, 
1996, acknowledging receipt of the deputy director's letter, 
and also "confirming our understanding that you, as the 
Deputy Director for the Site Mitigation Program, have the 
authority to request that EPA list sites on the NPL."

 Petitioners argue that this exchange of letters between the 
EPA and Deputy Director Blais did not satisfy the require-
ments of the Appropriations Act. Petitioners contend, and 
we agree, that if the Act was not satisfied, the proposal was 
null and void. Cf. National Treasury Employees Union v. 
Devine, 733 F.2d 114, 119-20 (D.C. Cir. 1984) (holding that 
where Congress enacted an appropriations rider specifying 
that funds could not be used to effectuate new rules, the 
Office of Personnel Management's implementation of recently 
promulgated rules was prohibited and the rules were ren-
dered null and void). We further agree with petitioners that 
absent a valid proposal, the Administrative Procedure Act's 
requirements for notice of proposed rulemaking would not be 


satisfied, rendering the subsequent listing invalid. See 5 
U.S.C. s 553(b).

 EPA has not argued that the listing can stand if the 
proposal was invalid. However, EPA claims that the letter 
from Deputy Director Blais satisfied the requirements of the 
Appropriations Act, so that the proposal was entirely proper. 
EPA argues that finding the exchange of letters between 
EPA and Blais to be inadequate would elevate form over 
substance, and frustrate the intention of the affected state. 
Furthermore, EPA urges that overturning the proposal on 
this ground could result in an expensive and time-consuming 
reproposal.

 In contrast to its current arguments, EPA's actions leading 
up to the proposal demonstrate that it did understand the Act 
as requiring at least some type of letter from the Governor 
himself. EPA's May 24 letter to DTSC explained that EPA 
needed a letter from California's Governor requesting that 
the Del Amo site be proposed for listing, or alternatively, a 
letter from the governor delegating his authority to make 
such a request to another state official. We need not decide 
whether the alternative "letter of delegation" EPA proposed 
would have satisfied the Appropriations Act, as no such letter 
was sent. The letter of May 30, from Deputy Director Blais, 
was rather clearly of neither of the types EPA had requested. 
Nonetheless, EPA proceeded to act on the basis of that letter, 
albeit after the exercise of responding to "confirm" that Blais 
had authority to request listing. The fact that Blais's letter 
was at the very least not what EPA normally sought is 
further reflected in the notice of proposed rulemaking for Del 
Amo. 61 Fed. Reg. 30,575 (June 17, 1996). That notice 
included a section entitled "Governor's Concurrence," which 
noted that EPA had received "letters from the appropriate 
governors" regarding each site proposed, with the exception 
of the Del Amo facility. The notice went on to state that 
EPA received a letter for the Del Amo site "from the State 
environmental agency with prior verbal agreement from the 
Governor of California." Id. at 30,578. The fact that EPA 
sought and obtained a governor's letter regarding the other 
sites whose listing was proposed suggests that the agency 


may not have viewed the letter they received from Blais as so 
clearly satisfying the Appropriations Act as their litigation 
position suggests.

 Whether or not EPA officials actually considered them-
selves to be in compliance with the Appropriations Act, we do 
not. It may well be the case that our holding will result in 
additional expense if EPA decides to again propose the Del 
Amo site for listing, but that expense is the cost of complying 
with the law. Cf. Garcia v. NLRB, 785 F.2d 807, 812 (9th 
Cir. 1985) ("[T]he rule of law requires, at an irreducible 
minimum, that all citizens obey the law regardless of econom-
ic cost."). We refuse to ignore the plain language of the Act 
in order to avoid potential costs which would not have arisen 
had EPA complied with the statute's language in the first 
instance. Indeed, when a statute's meaning is clear, and the 
enactment is within the constitutional authority of Congress, 
the "sole function of the courts is to enforce it according to its 
terms." Higgins v. Marshall, 584 F.2d 1035, 1038 (D.C. Cir. 
1978) (quoting Caminetti v. United States, 242 U.S. 470, 485 
(1917)). In this case, the terms of the statute are clear. The 
Act explicitly requires "a written request ... from the Gover-
nor of the State," and we decline to treat this language as 
being satisfied by a letter from a deputy director of the 
state's environmental agency simply because the letter pur-
ports to be on behalf of the administration.1

 EPA suggests that Congress really only sought the approv-
al of the state, and that the state here clearly approved of the 
listing, so that reading the Act literally needlessly frustrates 
the state's intention. We find this argument unconvincing. 
As petitioners correctly note, other portions of the Appropria-

__________
 1 Our dissenting colleague would find that the words "from the 
Governor of the State" encompass the concept of being "from" 
someone other than the governor. To expand her example, she 
would find that the phrase "memo from the manager" could mean a 
memo from either the manager or from someone else who purport-
ed to represent the manager. We do not follow her reasoning. 
Dissent at 2, n.2.

tions Act authorize action based on requests from state 
officials other than the governor. See Pub. L. No. 104-134, 
110 Stat. 1321-299 (1996) (authorizing certain grants to states 
"at the request of the Governor or other appropriate State 
official ..."). We see no reason to depart from the usual 
canon that when Congress uses different language in differ-
ent sections of a statute, it does so intentionally. See Russel-
lo v. United States, 464 U.S. 16, 23 (1983); International 
Union, UMWA v. MSHA, 823 F.2d 608, 617-18 (D.C. Cir. 
1987). Furthermore, unlike EPA, we are unwilling to hy-
pothesize a "substance" of the Appropriations Act removed 
from its "form" when the text is so explicit. Speculation 
about whether Congress actually intended to require written 
authorization from the Governor or merely to ensure some 
other form of state authorization is inappropriate where the 
statute's "commonly accepted meaning" is clear and there is 
no "reason to mistrust the common sense understanding of 
the statutory language." Lubrizol Corp. v. EPA, 562 F.2d 
807, 818 (D.C. Cir. 1977). See also Ernst & Ernst v. Hoch-
felder, 425 U.S. 185, 198-99 n.25 (1976); United States v. 
Gonzales, 117 S. Ct. 1032, 1036 (1997) (quoting United States 
v. Wiltberger, 18 U.S. (5 Wheat.) 76, 95-96 (1820) (Marshall, 
C.J.) ("Where there is no ambiguity in the words, there is no 
room for construction. The case must be a strong one 
indeed, which would justify a court in departing from the 
plain meaning of words ... in search of an intention which 
the words themselves did not suggest.")).

 In this case, we see no reason to be at all skeptical that 
Congress meant what it said. It is perfectly reasonable for 
Congress to make a deliberate choice to require the attention 
of the Governor rather than another state official. When the 
Appropriations Act was passed, the reenactment of CERCLA 
was uncertain, and Congress accordingly sought to limit new 
listings and proposals for listing. See 110 Stat. 1321-298 
(permitting use of funds for additional listing based on writ-
ten request from governor or legislation to reauthorize 
CERCLA). Congress could well have viewed requiring a 
written request from the governor of the affected state as a 
more significant limitation on new proposals and listings than 


simply requiring authorization from a lower-level state offi-
cial. Indeed, a site whose listing merits the attention and 
approval of the governor may be more clearly a true priority 
of the state than a site known only to the state's single-
mission environmental agency. We have previously observed 
with reference to the federal government that "single mission 
agencies do not always have the answers for complex regula-
tory problems." Sierra Club v. Costle, 657 F.2d 298, 406 
(D.C. Cir. 1981). Thus, the constitutional authority of the 
Chief Executive serves the practical purpose of ensuring "a 
careful weighing" of the broader implications of concern to 
the unitary executive. Id. The explicit language of the Act 
evidences a congressional decision that the same is true of the 
states. This is hardly an absurd conclusion that would drive 
us to seek an intent at odds with the statute's plain language. 
We therefore refuse to join EPA in its assumption that 
Congress was not concerned with whether the authorization 
came directly from the governor. Instead, we enforce the 
statute according to its terms--terms which require a written 
authorization from the governor which EPA failed to obtain in 
this case.

 Conclusion

 We conclude that the proposal for listing the "Del Amo" 
site on the NPL failed to comply with the Omnibus Consoli-
dated Rescissions and Appropriations Act of 1996. Accord-
ingly, the proposal was null and void, and the subsequent 
listing of the site was necessarily invalid.


 Wald, Circuit Judge, dissenting: My colleagues invalidate 
the listing of the Del Amo site--the result of a 15-year 
investigation and proceeding--on the sole ground that there 
was no "written request" for such listing "from the Governor" 
as required by the relevant Appropriations Act. In truth the 
Deputy Director of the California Department of Toxic Sub-
stances Control wrote to EPA reporting that the DTSC "on 
behalf of the Wilson Administration concurs with ... [the] 
proposal to list" the site and later EPA reported in the 
Federal Register that it had received a letter from the State 
environmental agency "with prior verbal agreement from the 
Governor of California." No one has disputed the accuracy of 
those statements.

 Thus we are confronted with the issue of whether a letter 
from the relevant agency stating that it had obtained the 
concurrence of the Governor to a proposal for listing suffices 
to meet the statutory command that there be a "written 
request" "from the Governor." Agreeing with my colleagues 
that agencies do not have discretion to ignore statutory 
commands, I would nonetheless find EPA to be in compliance 
here. The written request part is satisfied beyond doubt, and 
the request contains an undisputed statement that it is made 
with the concurrence of the Governor's administration. (This 
is validated by the later explanation in the Federal Register 
that the Governor's concurrence had been verbal.) Under 
such circumstances I would conclude that the request is "from 
the Governor." The statute nowhere commands that the 
request be personally signed by him.

 The purpose of this statutory requirement has surely been 
met. No one in the 15 years of this controversy has pointed 
to any harm to any party or the statutory goal that has 
ensued from this form of compliance.1 And the significant 

__________
 1 Moreover, even assuming there were some technical error here, 
section 706 of the Administrative Procedure Act provides that a 
court in reviewing agency action must take "due account ... of the 
rule of prejudicial error." Applied to this case, the rule of prejudi-
cial error presumably means that petitioners must show that they 
were prejudiced by the EPA's failure to procure a letter written by 

costs of going back to square one, while in no way would they 
excuse ignoring the requirement, at least suggest careful 
consideration as to whether it has been in fact violated.

 Surely it would have been far preferable for EPA to have 
insisted on obtaining a direct communication written by the 
Governor as it did in the case of the other states. But in 
these circumstances, we have the functional equivalent, and I 
think the statute can reasonably bear the meaning given it 
here.2

__________
the hand of the Governor of California. See, e.g., Doolin Sav. Bank 
 v. Office of Thrift Supervision, 139 F.3d 203, 212 (D.C. Cir. 1998); 
All Indian Pueblo Council v. United States, 975 F.2d 1437, 1443 
(10th Cir. 1992) (agency's failure to grant an administrative appeal 
not prejudicial when district court could resolve the same legal 
issues and remand to agency would be "an exercise in futility"). 
We have no reason to suspect, based on the letter from DTSC and 
the EPA's representation in the Federal Register of the Governor's 
oral agreement, that the Governor would have acted in a contrary 
way if the demand for a signed letter had been pressed.

 2 "From" is "used as a function word to indicate the source or 
original moving force of something." Webster's Third Int'l Dictio-
nary 913 (1976). In every day parlance, when a person asks, "Who 
is this memo from?" and the memo was written and signed by a 
subordinate "on behalf of" the manager, the correct answer is not 
necessarily "it is from a subordinate," but rather "it is from the 
manager." In the majority's view, however, the correct answer 
could only be "the subordinate" unless the manager had personally 
dictated the memo. This does not comport with common under-
standing.